**W.F. BARNES, Plaintiff,**

v.

**FOREST HILLS INVESTMENT, INC. and N.D. Hooks, Individually, Defendants.**

No. 1:97–CV–0492.

United States District Court, E.D. Texas, Beaumont Division.

June 29, 1998.

Pannal Alan Sanders, Sanders & Sanders, Orange TX, for plaintiff.

Brack Jones, Jr., Beaumont, TX, for defendant.

## *MEMORANDUM OPINION*

COBB, District Judge.

Before this court is Plaintiff's Request for Enforcement of a Final Court Order and Petition for a Preliminary and Permanent Injunction, filed by W.F. Barnes. This action arose from a dispute over the meaning of a legally enforceable settlement contract entered before this court on May 21, 1997. The settlement agreement set the expiration date of Defendants' right to cut and remove timber off Plaintiff's land. The current dispute is whether the settlement agreement covered seven tracts of Plaintiff's land or only a limited number of tracts. For the reasons stated below, this court finds that Plaintiff is entitled to have the court order adopting the settlement agreement enforced against Tracts 5, 6, and 8, and is entitled to a permanent injunction against Defendants prohibiting Defendants from cutting timber, removing timber, or occupying any part of Tracts 5, 6, or 8. This court, therefore, GRANTS Plaintiff's Request and Petition.

### I. FACTUAL BACKGROUND

On August 30,1996, Defendant, N.D. Hooks, as president of Forest Hills Investments, executed a warranty deed conveying twelve tracts of land to Plaintiff, W.F. Barnes Corporation. The deed excepted and reserved certain rights to Defendants on a few of the tracts. On Tracts 7, 9, 11, and 12, Defendants reserved the right to cut and remove all merchantable timber until February 1, 1997. On Tracts 5, 6, and 8, Defendants reserved the right to cut and remove all merchantable timber until September 1, 1998.

In December 1996, Defendants notified Plaintiff that inclement weather prevented them from removing timber from certain tracts because unusually hard rains made operating equipment on the ground nearly impossible. The parties agreed that the performance of the contract was made impracticable by an Act of God—the incessant rain—and further agreed to modify the terms of

the reservations. A modification agreement was drafted which purported to extend the deadline for harvesting timber on Tracts 7, 9, 11, and 12 from February 1, 1997 until June 1, 1997, and shorten the deadline for Tracts 5, 6, and 8 from September 1, 1998 to December 31, 1997. The agreement, however, was never executed.

Defendants filed suit in Texas state court asking for specific performance of the unexecuted modification agreement as it related to Tracts 7, 9, 11, and 12. The case was removed to this court. Before trial, the parties agreed to terms on a settlement agreement. The first version of the settlement agreement was drafted by Plaintiff's attorney. On May 5, 1997, during the settlement negotiations, counsel for Plaintiff wrote a letter to counsel for Defendants in which he wrote:

> I would hope that Mr. Hooks is dedicating his efforts to complying with the settlement and that upon his successful performance, will insure that *all timber harvesting and property restoration will be accomplished by June 15, 1997, on the properties described in the deed instrument*, dated August 30, 1996 and recorded in Volume 1087 at Page 268 of the Deed Records of Hardin County, Texas.[1]

(Emphasis added). After some suggested revisions by Defendants' counsel were incorporated during a volley of negotiations, the final agreement was duly executed and presented to the court with an agreed motion to dismiss the suit. The final agreement contained the following terms:

> 1. Timber harvest contract on the subject property extended to 6–15–97, such agreement being a specific term and provision of that certain warranty deed dated, August 30, 1996, recorded in Volume 1087 at Page 268 of the Deed Records of Hardin County, Texas, a true and correct copy of such deed being attached hereto and fully incorporated herein for all purposes, marked as Exhibit A.

1. On August 28, 1997, Frank Barnes, the President of Plaintiff W.F. Barnes Corporation, executed an affidavit swearing that he spoke with Mr. Hooks regarding the settlement and "directed that his timber harvest operations on *all of the*

*described lands* in the recorded in Volume 1087 at Page 268 of the Deed Records of Hardin County, Texas should be terminated on or before June 15, 1997." (Emphasis added).

2. All timber harvesting, equipment removal and restoration of the property will be completed on or before 6–15–97;

3. Forest Hills Investments, Inc., will tender the sum of $30,000.00, payable in a fully negotiable check, payable to W.F. Barnes Corporation, delivered to the possession of its counsel, Mr. Bill Beggs, contemporaneous with the submission and execution of formal settlement agreement as compensation for economic damages relative to the litigation, such check will be tendered directly to the W.F. Barnes Corporation no later than Friday, May 2, 1997;

4. All roads on the subject properties will be restored and repaired to conditions as existed prior to the conduct of the harvest;

5. The above referenced litigation shall be dismissed in the Federal and State courts, the filed lis pendens shall be immediately relinquished and voided by filings exhibiting their release of effect and the action will be dismissed with prejudice.

On May 21, 1997, the court dismissed the lawsuit with prejudice based on the agreement of the parties.

In spite of the settlement agreement, a further dispute arose out of the parties' asserted rights to the land. On July 11, 1997, in the course of attempting to sell the land, Plaintiff discovered that Defendants were still removing timber from Tracts 5, 6, and 8. Counsel for Plaintiff wrote a letter to Defendants' counsel requesting that Defendants immediately cease timber harvesting and vacate the premises. When Defendants refused to comply with Plaintiff's demand, Plaintiff filed suit in this court seeking a preliminary injunction, a permanent injunction, and enforcement of the settlement agreement.

## II. Analysis

### A. Jurisdiction

This court notes probable diversity jurisdiction pursuant to 28 U.S.C. § 1441. Plaintiff is a resident of Alabama and Defendants are residents of Texas. Due to the potential business losses to be suffered by Plaintiff, the value of the case exceeds the jurisdictional amount.

### B. Choice of Law

In deciding the choice of law, a federal court sitting in diversity must first characterize the action as one sounding in contract, property, or tort. *Continental Oil Co. v. General American Transp. Corp.*, 409 F.Supp. 288, 293 (S.D.Tex.1976). A federal court must classify the action in accordance with the law of the forum. *Id.* Under either of two possible theories, this cause of action sounds in Texas contract law. First, if the action is characterized as one for the enforcement of a settlement agreement, settlements are governed by the principles of contract law. *Montanaro v. Montanaro*, 946 S.W.2d 428, 430 (Tex.App.1997); *Shaw v. Kennedy*, 879 S.W.2d 240, 247 (Tex.App.1994). Second, if the action is viewed as one to determine the rights of the parties to a sale of timber, under Texas law such a transaction involves a contract for the sale of goods, not realty. V.T.C.A., Bus. & C.Code § 2.107 (West 1994); *and see Kirby Forest Industries, Inc. v. Dobbs*, 743 S.W.2d 348, 354 (Tex.App.1987). Therefore, this court will evaluate the choice of law issue under the milieu of contract law.

A federal court sitting in diversity applies the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg., Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Texas choice of law rules, courts apply the substantive law of the state having the most significant relationship to the litigation. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677–679 (Tex.1990) (adopting the Restatement approach); *see also* Restatement (Second) of Conflict of Laws § 188 (1971). Under section 188 of the Restatement (Second) of Conflict of Laws, the choice of law for a contract cause of action is evaluated in the following way:

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

■ Applying those factors to the facts of this case, it is clear that Texas substantive law must be applied.[2] The place of contracting and the place of the negotiation of the contract were Texas—in the Texas offices of attorneys of the two parties. The place of performance of the contract is Texas because the timber to be harvested is located in Texas and the money was to be delivered to Defendants' attorney's office in Texas. The location of the subject matter of the contract was the property described in the Hardin County, Texas deed and located in Hardin County. Finally, Plaintiff is not a resident Texas, but Plaintiff chose the state of Texas as the forum. The state with the most significant relationship to the transaction and the parties is Texas. Therefore, Texas contract law and its pertinent rules of construction must be applied in interpreting and enforcing the settlement agreement.

## C. The Question of Ambiguity

### 1. Ambiguity in Contract

■ Under Texas law, the court must enforce the unambiguous language in a contract as written, and the applicable standard is "the objective intent" evidenced by the language used, rather than the subjective intent of the parties. *Clardy Manufacturing Co. v. Marine Midland Business Loans Inc.*, 88 F.3d 347, 352 (5th Cir.1996). If the written instrument is susceptible to only one reasonable construction, it will be given force. *Westchester Fire Ins. v. Heddington Ins. Ltd.*, 883 F.Supp. 158, 163 (S.D.Tex. 1995). Determining whether a contract is ambiguous is a question of law. *Bloom v. Hearst Entertainment, Inc.*, 33 F.3d 518, 521 (5th Cir.1994). Ambiguity arises when the

court is left genuinely uncertain which of two possible meanings is the proper one. *South Hampton Co. v. Stinnes Corp.*, 733 F.2d 1108, 1114 (5th Cir.1984). A contract is not ambiguous if it is so worded that a court may properly give it a definite legal meaning. *Id.* Furthermore, an ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; for an ambiguity to exist, both interpretations must be reasonable. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996).

■ In assessing whether an ambiguity exists, the court should evaluate the language of the instrument in light of the surrounding circumstances existing at the time of contracting. *Thrift v. Estate of Hubbard*, 44 F.3d 348, 358 (5th Cir.1995). If a contract is vested with a definite legal meaning, however, there is no need to speculate on the intentions of the parties. *In re Corpus Christi Hotel Partners, Ltd.*, 133 B.R. 850, 853 (Bankr.S.D.Tex.1991). It follows that parol evidence is not admissible to render a contract ambiguous, which, on its face, is capable of being given a definite certain legal meaning. *Lewis v. East Texas Finance Co.*, 136 Tex. 149, 146 S.W.2d 977, 980 (Tex.1941). This rule obtains even to the extent of prohibiting proof of circumstances surrounding the transaction when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties, or is so worded that it is not fairly susceptible of more than one legal meaning or construction. *Id.*

### 2. The Application of Ambiguity Law

■ Reviewing the question of ambiguity as a matter of law, this court finds that the settlement agreement, when read as a whole, is ambiguous. The ambiguity in the agreement lies in the fact that the agreement is totally unclear as to whether it affected Tracts 7, 9, 11, and 12 only or all the tracts referenced in the warranty deed. When read as a whole, there are at least two, and

---

**2.** Even assuming arguendo that the cause of action sounds in property, the situs of the property generally controls the choice of law. *See Commissioner of Internal Revenue v. Skaggs*, 122 F.2d 721, 723 (5th Cir.1941). The property is in Texas, so the substantive law of Texas would apply.

possibly three, different reasonable interpretations of the parties' intended.

The first reasonable interpretation of the agreement as a whole could be as follows:

Clause 1 of the contract extended, from February 1, 1997 until June 15, 1997, the deadlines for completing timber harvesting on Tracts 7, 9, 11, and 12.

> 1. *Timber harvest contract on the subject property extended to 6–15–97,* such agreement being a specific term and provision of that certain warranty deed dated, August 30, 1996, recorded in Volume 1087 at Page 268 of the Deed Records of Hardin County, Texas, a true and correct copy of such deed being attached hereto and fully incorporated herein for all purposes, marked as Exhibit A.

In exchange for the extension on Tracts 7, 9, 11, and 12, Clause 2 shortens the deadline on Tracts 5, 6, and 8 back to June 15, 1997 from September 1, 1998—the date in the deed.

> 2. *All timber harvesting, equipment removal and restoration of the property will be completed on or before 6–15–97;*

Clause 3 makes Plaintiff whole for having endured the early litigation process of the first suit.

> 3. Forest Hills Investments, Inc., will tender the sum of $30,000.00, payable in a fully negotiable check, payable to W.F. Barnes Corporation, delivered to the possession of its counsel, Mr. Bill Beggs, contemporaneous with the submission and execution of formal settlement agreement *as compensation for economic damages relative to the litigation,* such check will be tendered directly to the W.F. Barnes Corporation no later than Friday, May 2, 1997;

Clause 4 reiterates Defendants' duties to restore the property to its pre-harvest condition, as was required by the original deed.

> 4. All roads on the subject properties will be restored and repaired to conditions as existed prior to the conduct of the harvest;

Clause 5 merely resolved to dismiss the litigation.

> 5. The above referenced litigation shall be dismissed in the Federal and State courts, the filed lis pendens shall be imme-

diately relinquished and voided by filings exhibiting their release of effect and the action will be dismissed with prejudice.

Therefore, under the first possible interpretation, Defendants' right to harvest timber on all seven tracts expired on June 15, 1997.

A second possible interpretation could be explained as follows:

> The settlement agreement was reached to settle the prior suit only. The complaint in the prior suit only mentioned Tracts 7, 9, 11, and 12. Therefore, Clause 1's term "subject property" referred only to the tracts that were the subject of the prior suit—Tracts 7, 9, 11, and 12. Clause 2's term "property" simply means the property discussed in Clause 1—again, just Tracts 7, 9, 11, and 12. Finally, Clause 4's term "subject properties" reinforces the suggestion that only the property that was the subject of the prior suit is implicated by the agreement.

Under this interpretation of the agreement, Defendants would still have the right to harvest timber on Tracts 5, 6, and 8 until September 1, 1998.

Finally, a third possible interpretation of the agreement could be explained as follows:

> The term "subject property" in Clause 1 refers to all property that is the subject of "that certain warranty deed dated, August 30, 1996, recorded in Volume 1087 at Page 268 of the Deed Records of Hardin County, Texas, a true and correct copy of such deed being attached hereto and fully incorporated herein for all purposes, marked as Exhibit A." Clause 2 refers to "[a]ll timber harvesting, equipment removal and restoration of the property" and not just to the operations on Tracts 7, 9, 11, and 12.

According to this interpretation, the term "subject property" would not refer only to the property mentioned in the previous suit, but to all the property described in the deed. All of Defendants' harvesting rights then would have expired on June 15, 1997.

The objective intent of the parties is not even remotely clear from the language of the agreement. Each of the three interpretations are reasonable in light of the circumstances surrounding the formation of the

agreement. Both parties were trying to prevent the continued prosecution of the litigation while preserving their rights to the fullest extent via telephone calls and facsimile transmissions. These circumstances resulted in an inartfully worded settlement contract, despite the fact that it was reviewed and agreed upon by both parties and their respective attorneys. None of the parties foresaw the potential interpretation problems of the language in the agreement. Because any of the three aforementioned interpretations are reasonable in light of the circumstances surrounding the contracting, this court cannot give the agreement a definite legal meaning as to which tracts were included and is left genuinely uncertain which of the possible meanings is the proper one. Therefore, the contract is found to be ambiguous and will be construed, for purposes of the motion for preliminary injunction, as a matter of law.

### D. Construing the Ambiguous Contract

#### 1. Construction of Contractual Language

■ If the court finds that the contract is subject to two or more reasonable interpretations, the court must resort to the rules of construction of contracts to resolve the ambiguity. *Westchester Fire, supra,* at 163. The court's primary goal in construing an ambiguous contract is to discern the parties' objective intent as it is set out in the contract. *Mustang Tractor & Equipment Co. v. Liberty Mutual Ins. Co.,* 76 F.3d 89, 91 (5th Cir.1996). The court must read all the provisions of the agreement together, interpreting it so as to give each provision its intended effect. *Id.* The court must be particularly wary of isolating individual words, phrases, or clauses and reading them out of the context of the document as a whole. *Id.* Only if a contract remains ambiguous, despite the application of these principles, should the court consider extrinsic evidence to ascertain the parties' subjective intent. *Id.* Extrinsic or parol evidence is not admissible to contradict or vary terms of the contract, but can be admitted to resolve an ambiguity by explaining what the parties intended. *Id.* If the contract remains ambiguous, the court should examine the circumstances surrounding the formula-

tion and execution of the contract. *United States v. Aluminum Co. of America,* 824 F.Supp. 640, 651 (E.D.Tex.1993); *Columbia Gas, supra,* at 591. The history of negotiations between the parties, as well as the events which occurred during the performance of the contract, are relevant in ascertaining the parties' true intent. *Aluminum Co., supra,* at 651–52. An agreement should be construed in such a way as to make the obligations imposed by its terms mutually binding upon the parties, unless such interpretation is wholly negated by the language used. *Portland Gasoline Co. v. Superior Marketing Co.,* 150 Tex. 533, 243 S.W.2d 823, 824 (1951).

■ As a general rule, a contract is construed against its drafter only as a last resort—after the application of ordinary rules of construction leave reasonable doubt as to its interpretation. *Id.* at 652. Furthermore, the principle of *contra proferentem* is most typically applied in interpretation of standard form contracts or invoked against a party operating at a distinct bargaining advantage. *See, e.g., Gonzalez v. Mission American Ins., Co.,* 795 S.W.2d 734, 737 (Tex.1990); *Republic Nat'l Bank of Dallas v. Northwest Nat'l Bank of Fort Worth,* 578 S.W.2d 109, 115 (Tex.1978); **E.A. FARNSWORTH,** CONTRACTS § 7.11 (2d ed.1990). Construing the contractual language against the original drafter is particularly inappropriate when the agreement resulted from a volley of negotiations between two equally footed parties.

#### 2. Application of the Rules of Construction

Before applying the rules of construction of contracts to this agreement, this court remained confounded and befuddled as to what the parties' objective intent was when they agreed to the words appearing within the four corners of this settlement agreement. It is only after applying the rules of construction and considering extrinsic evidence of the history of negotiations between the parties and circumstances surrounding the formulation and execution of the contract that this court can glean what the parties subjectively hoped to accomplish with the

settlement agreement. Based on a review of the language of the contract, the circumstances surrounding the formation of the contract, and the extrinsic evidence, it is clear that the first of the three previously discussed interpretations of the agreement is the one that most properly gives effect to the intent of the parties.

The contract when read as a whole makes sense only when interpreted to give both parties mutual obligations. Both parties are experienced in business and real estate and had approximately equal bargaining positions. So the court can presume that each party intended to get something in exchange for giving the other a new right. *Portland Gasoline, supra,* at 824 ("In the transactions of business life, sanity of end and aim is at least a presumption, though a rebuttable one. An agreement should, moreover, be construed in such a way as to make the obligations imposed by its terms mutually binding upon the parties, unless such interpretation is wholly negatived by the language used."). According to the provisions of the warranty deed, before the settlement was reached, Defendants had the right to harvest timber from Tracts 7, 9, 11, and 12 until February 1, 1997 and from Tracts 5, 6, and 8 until September 1, 1998. Under any reading of the subsequent agreement, Defendants' right to harvest timber on Tracts 7, 9, 11, and 12 was extended from February 1, 1997 until June 15, 1997 in Clause 1. The court, therefore, presumes, and is not rebutted by any language in the agreement, that in exchange for extending the deadline, Plaintiff should receive some reciprocal benefit in one of the other clauses of the agreement. *See id.,*

Clause 3 clearly states that Defendants' tendering of $30,000 was "as compensation for economic damages relative to the litigation." The explicit language of the agreement tells the court that the money was not the *quid pro quo* for the extension of the harvesting deadline. Clause 4 merely reiterates Defendants' preexisting obligation from the warranty deed to return the property to its pre-harvest condition. Receiving a promise to fulfill a preexisting obligation in exchange for granting valuable harvesting rights is hardly a reasonable interpretation of what an experienced businessperson would negotiate as a settlement agreement. awards. *See, e.g., Lone Star Steel Co. v. Scott,* 759 S.W.2d 144, 153 (Tex.App.–Texarkana 1988) (noting that a promise to fulfill a pre-existing duty cannot serve as consideration in a contract); RESTATEMENT (SECOND) OF CONTRACTS § 73 (1981); 1A CORBIN ON CONTRACTS § 192 (1963). Clause 5 requires both parties to forebear from further litigating the parties' respective rights under any previous modification or agreement. Plaintiff and Defendants are mutually bound by Clause 5, which leaves Plaintiffs without any sort of consideration for granting the extension on Tracts 7, 9, 11, and 12.

Only Clause 2 is left as a possible source of a reciprocal benefit to Plaintiff. Therefore, the only reasonable interpretation of the contract is that, while Clause 1 extended the deadline for certain tracts, the language of Clause 2 definitively limited all timber harvesting activities on the other lots to be completed on or before June 15, 1997. (*See Settlement Agreement,* at Clause 2 ("*All timber harvesting, equipment removal and restoration of the property will be completed on or before 6–15–97.*") (emphasis added)).

That the parties intended to mutually obligate themselves is further evidenced by Defendants' contentions in the first law suit they filed. Defendants' complaint in the first suit included the unexecuted modification agreement as an attached exhibit. Before the parties agreed to the settlement contract at issue in this case, Defendants asked this court to enforce an oral contract between the parties that was to be evidenced by the modification agreement. The modification agreement stated that the deadline for timber harvesting on Tracts 7, 9, 11, and 12 would be extended until June 1, 1997 and the deadline for harvesting on Tracts 5, 6, and 8 would be shortened from September 1, 1998 to December 31, 1997. Therefore, Defendants' own exhibit demonstrates an understanding during the negotiations between the parties that the *quid pro quo* for extending the deadline for certain tracts would be shortening the deadline for the other tracts.

Finally, in a letter dated May 5, 1997, three weeks after the volley of negotiations between Plaintiff and Defendants and two weeks before the final settlement agreement was filed with the court, Plaintiff's attorney stated:

I would hope that Mr. Hooks is dedicating his efforts to complying with the settlement and that upon his successful performance, will insure that *all timber harvesting and property restoration will be accomplished by June 15, 1997, on the properties described in the deed instrument*, dated August 30, 1996 and recorded in Volume 1087 at Page 268 of the Deed Records of Hardin County, Texas.

It clearly was within the contemplation of Plaintiff that timber harvesting on all tracts be completed by June 15, 1997, and Defendants had clear notice that Plaintiff construed the agreement to so hold. Despite that notice, there is no evidence that Defendants ever attempted to clarify or modify the wording of the agreement to reflect the position for which they now argue—that the intent of the parties was only to change the deadline for Tracts 7, 9, 11, and 12 and not to affect the deadline for Tracts 5, 6, and 8.

Defendants urge this court to enforce the settlement agreement in a manner similar to the second of the possible interpretations in Section II.C.2. of this opinion. Defendants want this court to allow them to inure to the benefit of the deadline extension without having to offer one iota in reciprocal consideration. While Defendants might be able to negotiate such a deal in other circumstances, it would be wholly unreasonable for this court to find that was the intent of the parties in negotiating the present settlement agreement. The contract can only be reasonably interpreted if Defendants are charged with some obligation, duty, or forbearance in exchange for the extension. From the written words of the contract, the only obligation that reasonably can be interpreted is that timber harvesting on Tracts 5, 6, and 8 must have been completed by June 15, 1997.

### III. Conclusion

To interpret the agreement in a way that allows Defendants more time to harvest timber on certain tracts without giving something in return for that added benefit would fly in the face of both reasonable business sense and ordinary common sense. All the parties to this agreement appear to be reasonable and experienced business people. The court must presume, without clear and express language to the contrary, that the parties to the contract intended to mutually bind each other—that is, enter into a *quid pro quo*. The only place in the contract that gives Plaintiff anything in exchange for forbearing from his right to exclude Defendants from Tracts 7, 9, 11, and 12 beyond the original February 1, 1997 deadline is Clause 2. Therefore, this court must find that the contract when properly construed limited timber harvesting on all seven tracts to the June 15, 1997 deadline.

To find otherwise would be to presume Plaintiff to be an unreasonable businessman or a generous philanthropist. While the latter might be true, the court finds that it was not in that capacity that Plaintiff entered into this settlement agreement. If the court is wrong with regard to the intent of Plaintiff, then perhaps Plaintiff has more land available for gratuitous transfer.

IT IS ORDERED, ADJUDGED, AND DECREED, therefore, that Plaintiff's Petition for a Preliminary and Permanent Injunction is GRANTED. Defendants are enjoined from conducting any further timber harvesting activities on Tracts 7, 9, 11, and 12, as well as Tracts 5, 6, and 8.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff's Request for Enforcement of a Final Court Order is GRANTED and, accordingly, the parties are ordered to fulfill their respective remaining obligations under the settlement agreement.