United States Court of Appeals,

Fifth Circuit.

No. 94-20758.

MUSTANG TRACTOR & EQUIPMENT COMPANY and Eureka Investment Company, Plaintiffs-Appellants,

v.

LIBERTY MUTUAL INSURANCE COMPANY, et al., Defendants,

First State Insurance Company, Defendant-Appellee.

Feb. 22, 1996.

Appeal from the United States District Court for the Southern District of Texas.

Before DAVIS and PARKER, Circuit Judges, and BUNTON,[1] District Judge.

W. EUGENE DAVIS, Circuit Judge:

Mustang Tractor & Equipment Company and its wholly-owned subsidiary Eureka Investment Company (hereinafter collectively referred to as Mustang) appeal from the district court's order denying their motion and granting their insurer's motion for summary judgment. Appellants contend the district court erred in sustaining their insurer's coverage defense. We affirm.

I.

In 1973 Mustang purchased an eighteen and a half acre tract of land from Olin Corporation (Olin) for $300,000. Olin had operated a pesticide blending facility on the property and, in the process, had contaminated the land with hazardous chemicals. Since its discovery in 1981, this contamination has spawned a number of lawsuits, only two of which are relevant here.

After being required by the Texas Water Commission to clean up contamination in ditches surrounding the property, Olin sued Mustang in state court for contribution. Olin alleged that, by demolishing buildings and grading the property, Mustang had released additional pollutants into the ditches. Although the district court granted Mustang's motion for summary judgment, the appellate court reversed and remanded the case for trial. It found material fact issues with respect to whether

---

[1]District Judge of the Western District of Texas, sitting by designation.

Mustang's activities had contributed to the pollution. Mustang then settled with Olin by agreeing to pay Olin $600,000 toward the remediation costs.

The second action followed in October of 1990 when Mustang sued its primary insurer, Liberty Mutual Insurance Company, and its excess carriers, among them First State Insurance Company (First State). Mustang sought to recover under its Comprehensive General Liability (CGL) Policies the sum it had expended in the Olin settlement and the costs of defending several other suits. Mustang and the various insurers filed cross-motions for summary judgment, and in October, 1993, the district court issued a Memorandum Ruling in which it relied on a number of theories to grant the various insurers' motions for summary judgment. On appeal Mustang contends the district court erred in holding that appellee First State's CGL policy does not cover the portion of the clean-up costs Mustang agreed to bear in the Olin settlement.[2] Evaluating this assertion requires that we examine the alleged discharges Olin asserted against Eureka in the state court litigation.

Olin alleged that when Mustang took over the property, "all the former Olin manufacturing buildings, a labelled Toxaphene tank, labelled Xylene tanks, some equipment used to process the sulphur and pesticide products and various other items that had been associated with Olin's former processing plant" were intact. In 1977 Mustang hired Olshan Demolishing Company to raze the structures, extract concrete foundations to at least three feet below the ground, and remove all trash from the site. Olshan agreed to perform the work for $48,000 and to complete the job within five months of receiving its demolition permits from the City of Houston. Olin's complaint alleges that outside contractors also "remove[d] all ... tanks; strip[ped] vegetation; [dug] pits and trenches; install[ed] underground tanks and pipes; bulldoze[d] mounds of dirt; pave[d] some areas; cap[ped] others with limestone and construct[ed] a new building" and that "Mustang directed its own employees to perform portions of this demolition, bulldozing, removal of tanks, burying materials on Site, and general construction work." Finally, the summary judgment record reflects that Mustang employees used a D-6 bulldozer and a road maintainer to grade the land. Olin contended that these activities caused contamination to enter the ditches.

---

[2]Mustang's other insurers settled and are not involved in this appeal.

With this factual predicate from the summary judgment record, we turn to the coverage issue this case presents.

## II.

The CGL policy at issue precludes coverage for:

[A]ny liability of any insured arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes acids, alkalis, toxic chemicals, solids, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water *unless such discharge, dispersal, release or escape is sudden and accidental.* (emphasis added).

Mustang argues that this provision is ambiguous because the word "sudden" can mean either "unexpected" or "something that occurs quickly, rapidly or abruptly." According to Mustang, extrinsic evidence such as the circumstances surrounding the clause's adoption is admissible to resolve the ambiguity. First State, on the other hand, contends that appellant attempts to create an ambiguity where none exists; it argues that the term "sudden" is commonly understood to mean quickly or rapidly.

The parties agree that Texas law governs this case. The Texas Supreme Court, however, has not addressed the meaning of the clause at issue here, even though Texas appellate courts have discussed the question without reaching any conclusions.[3] Texas does, of course, have rules of contractual interpretation, and we apply those in resolving this issue. *See Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994). Texas law requires that courts strive to effectuate the intentions of parties as they are expressed in a contract. *National Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995). Courts must read all provisions of an agreement together, interpreting the agreement so as to give each provision its intended effect. *Forbau,* 876 S.W.2d at 133. We must be particularly wary of isolating individual words, phrases, or clauses and reading them out of the context of the document as a whole. *State Farm Life Ins. Co.*

---

[3]*See e.g., Union Pacific Resources Co. v. Aetna Casualty & Sur. Co.,* 894 S.W.2d 401, 405 (Tex.App.—Fort Worth 1994, writ denied) ("The interpretation of pollution exclusions for purposes of insurance coverage is a novel one in Texas."). The only decision affirmatively ruling on the question was subsequently withdrawn. *Circle "C" Ranch Co. v. St. Paul Fire & Marine Ins. Co.,* 1993 WL 142131 (Tex.App.—Austin) (defining "sudden" as not including a temporal element).

*v. Beaston,* 907 S.W.2d 430, 433 (Tex.1995). Only if a contract remains ambiguous, despite the application of these principles, may we consider extrinsic evidence. *National Union,* 970 S.W.2d at 520. Parol evidence of intent is admitted to explain an ambiguous pro vision, never to create the ambiguity. *Id.*

These rules lead us to conclude that Texas co urts will construe the pollution exclusion at issue here to bar coverage for releases that are not quick or rapid as well as accidental. When we turn to the dictionary we find several definitions of "sudden." *E.g., Webster's Third New International Dictionary* 2284 (1981) (listing as two of its alternate definitions "happening without previous notice or with very brief notice: coming or occurring unexpectedly: not foreseen or prepared for" and "characterized by swift action"). So we must examine the context in which the word is used. The appellee's pollution exclusion pairs "sudden" with "accidental." Because Texas courts agree that "accidental" generally describes an unforeseen or unexpected event, *see e.g., Republic Nat'l. Life Ins. Co. v. Heyward,* 536 S.W.2d 549, 554 (Tex.1976), giving "sudden" the same meaning would violate the requirement that we give each word effect. As one court has stated:

> The very use of the words "sudden and accidental" ... reveal a clear intent to define the words differently, stating two separate requirements. Reading "sudden" in its context, i.e., joined by the word "and" to the word "accident", the inescapable conclusion is that "sudden", even if including the concept of unexpectedness, also adds and additional element because "unexpectedness" is already expressed by "accident." This additional element is the temporal meaning of sudden, i.e. abruptness or brevity. To define sudden as meaning only unexpected or unintended, and therefore as a mere restatement of accidental, would render the suddenness requirement mere surplusage.

*Northern Ins. Co. of N.Y. v. Aardvark Assoc., Inc.,* 942 F.2d 189, 192-93 (3d Cir.1991) (quoting *Lower Paxon Township v. United States Fidelity & Guar. Co.,* 383 Pa.Super. 558, 577, 557 A.2d 393, 402 (1989), allocatur denied, 93 M.D. Allocatur Dkt. 1989 (Sept. 22, 1989)). Under Texas rules of construction, therefore, "sudden" must be read to include a temporal element. As there is only one reasonable interpretation of the word as it is used in this policy, it is not ambiguous. Mustang, therefore, is not entitled to offer extrinsic evidence in support of its definition of "sudden."

The only decisions we have found addressing this question under Texas law have reached the

same conclusion.[4]  And most federal circuit courts construing this pollution exclusion clause under the laws of the various states have determined that it is unambiguous and that "sudden" means quick or brief.[5]  The highest courts of the states are less certain, but approximately half of those addressing the question have interpreted "sudden" to mean "abrupt."[6]

We hold, therefore, that under Texas law this pollution exclusion clause is not ambiguous. "Sudden" may only reasonably be construed to mean quick or brief.  First State's policy, therefore, bars coverage for pollution that is not released quickly as well as unexpectedly and unintentionally.

This said, we have no difficulty concluding that the district court correctly denied Mustang coverage for the $600,000 settlement.  Under the allegations of Olin's pleadings, pollutants were released as the buildings were demolished and the contents graded into ditches.  Any contamination

---

[4]*Snydergeneral Corp. v. The Continental Ins. Co.,* No. 3-90-CV-2396-BD (N.D.Tex. Jan. 5, 1995); *Meridian Oil Prod., Inc. v. Hartford Acc. & Indem. Co.,* No. G-91-167 (S.D.Tex. March 4, 1993); *In re Texas Eastern Transmission Corp. PCB Contamination Ins. Coverage Litigation,* 870 F.Supp. 1293, 1349 (E.D.Pa.1992), *aff'd. on other grounds,* 15 F.3d 1249 (3d Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 291, 130 L.Ed.2d 206 (1994); *National Standard Ins. Co. v. Continental Ins. Co.,* No. CA-3-81-1015-D (N.D.Tex. Oct. 4, 1983).

[5]*E.g., A. Johnson & Co. v. Aetna Casualty & Sur. Co.,* 933 F.2d 66, 72-73 (1st Cir.1991) (Maine law); *Ogden Corp. v. Travelers Indem. Co.,* 924 F.2d 39, 42 (2d Cir.1991) (New York law); *Northern Ins. Co. of N.Y. v. Aardvark Assoc., Inc.,* 942 F.2d 189, 192-93 (3d Cir.1991) (Pennsylvania law); *United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.,* 856 F.2d 31, 34 (6th Cir.1988) (Kentucky law); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,* 40 F.3d 146, 152-53 (7th Cir.1994) (Indiana law); *Aetna Casualty & Sur. Co. v. General Dynamics Corp.,* 968 F.2d 707, 710 (8th Cir.1992) (Missouri law); *Smith v. Hughes Aircraft Co.,* 22 F.3d 1432, 1437 (9th Cir.1993) (California and Arizona law); *United States Fidelity and Guar. Co. v. Morrison Grain Co.,* 999 F.2d 489, 493 (10th Cir.1993) (Kansas law); *Charter Oil Co. v. American Employers' Ins. Co.,* 69 F.3d 1160, 1165 (D.C.Cir.1995) (Missouri law).

*But see CPC Int'l., Inc. v. Northbrook Excess & Surplus Ins. Co.,* 962 F.2d 77, 95 (1st Cir.1992) (New Jersey law); *New Castle County v. Hartford Accident & Indem. Co.,* 933 F.2d 1162, 1198-99 (3d Cir.1991) (Delaware law); *Broderick Investment Co. v. Hartford Accident & Indem. Co.,* 954 F.2d 601, 607 (10th Cir.) (Colorado law), *cert. denied,* 506 U.S. 865, 113 S.Ct. 189, 121 L.Ed.2d 133 (1992).

[6]*Kerr-McGee Corp. v. Admiral Ins. Co.,* 905 P.2d 760, 763 (Okla.1995); *Board of Regents of the University of Minn. v. Royal Ins. Co. of America,* 517 N.W.2d 888, 892 (Minn.1994); *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.,* 636 So.2d 700, 704 (Fla.1993); *Hybud Equip. Corp. v. Sphere Drake Ins. Co.,* 64 Ohio St.3d 657, 666, 597 N.E.2d 1096, 1102 (1992), *cert. denied,* 507 U.S. 987, 113 S.Ct. 1585, 123 L.Ed.2d 152 (1993); *Upjohn Co. v. New Hampshire Ins. Co.,* 438 Mich. 197, 207-08, 476 N.W.2d 392, 397-98 (1991); *Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc.,* 407 Mass. 675, 680-81, 555 N.E.2d 568, 572 (1990); *Waste Management of Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 699-700, 340 S.E.2d 374, 382-83 (1986).

resulting from these activities did not occur "suddenly." This conclusion is consistent with a recent opinion by the D.C. Circuit in *Charter Oil v. American Employers' Ins. Co.* In that case the court concluded that the spraying of dioxin-contaminated oil as a dust suppressant "over a period of at least two months, with each spraying lasting about 30-40 minutes" did not qualify as a "sudden" release. *Charter Oil,* 69 F.3d at 1170. We hold, therefore, that the CGL's pollution exclusion bars coverage for the settlement between Olin and the appellant.

For these reasons, we AFFIRM the district court's judgment dismissing Mustang's action.

AFFIRMED.