TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-98-00013-CV







Gulf Metals Industries, Inc., Gulf Reduction Corporation, and Gulf Reduction


Corporation as a Successor to Southern Zinc Company, Appellants



v.



Chicago Insurance Company, Interstate Fire & Casualty Company, Delta Lloyds

Insurance Company, First State Insurance Company, Insurance Company of

North America, Continental Casualty Company, Transcontinental Insurance

Company, CNA Lloyds of Texas, Transportation Insurance Company,

Fidelity & Casualty Insurance Company of New York

and Glen Falls Insurance Company, Appellees








FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT


NO. 96-04673A, HONORABLE F. SCOTT McCOWN, JUDGE PRESIDING







 Appellants Gulf Metals Industries, Inc., Gulf Reduction Corporation, and Gulf
Reduction Corporation as a successor to Southern Zinc Company (1) appeal the district court's grant
of summary judgment in favor of appellees, all of whom at one time or another issued policies of
insurance to Gulf Metals. (2) Gulf Metals claims that the district court erred in ruling that, as a
matter of law, the qualified polluter's exclusion clause contained in the policies of insurance issued
by CIC to Gulf Metals is unambiguous and thus precludes coverage for environmental cleanup
costs resulting from Gulf Metals' sale of zinc materials. We will affirm.


FACTUAL AND PROCEDURAL BACKGROUND

 The background facts are essentially undisputed. Gulf Metals, a Houston-based
corporation, has been in the business of buying, selling, recycling, and processing scrap metals
since 1951. From approximately 1977 until 1988, Southern Zinc sold zinc materials and by-products to Gulf Metals Industries. During this same period, both Southern Zinc and Gulf Metals
Industries sold zinc materials and by-products to the Stoller Chemical Company, located in South
Carolina, where Stoller manufactured and sold agricultural fertilizer supplements. In 1995, Gulf
Reduction Corporation merged with Southern Zinc and absorbed Southern Zinc's assets and
liabilities.

 It does not appear from the record that Gulf Metals Industries, Gulf Reduction
Corporation, or Southern Zinc knew, or had any reason to know, that Stoller's fertilizer-manufacturing operations would have serious adverse effects on the environment. Throughout the
time of the sales, fertilizer-manufacturing operations involving zinc were not thought to have
serious environmental ramifications to neighboring property and groundwater. However, the soil
and groundwater at the Stoller Site were later found to be contaminated. In 1994, the United
States Environmental Protection Agency (the "EPA") issued an administrative order requiring
Gulf Metals to participate in the cleanup of the Stoller Site and reimburse the EPA for existing
cleanup costs. South Carolina's state environmental agency issued a similar order to Gulf Metals
in 1997.

 Since 1958, Gulf Metals has purchased comprehensive general liability insurance
policies from numerous insurance companies including appellees. These policies provide, in
relevant part, that the insurer will pay "all sums which the insured shall become legally liable to
pay as damages because of bodily injury or property damage to which this insurance applies,
caused by an occurrence . . . ." The policies define "occurrence" as: "an accident, including
injurious exposure to conditions, which results in bodily injury or property damage during the
policy period neither expected nor intended from the standpoint of the insured." In 1970, the
liability insurance policies added the qualified polluter's exclusion, which provides:


This insurance does not apply to bodily injury or property damage arising out of
the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids,
alkalis, toxic chemicals, liquids or gases, waste materials or other irritants,
contaminants or pollutants into or upon land, the atmosphere or any watercourse
or body of water; but this exclusion does not apply if such discharge, dispersal,
release or escape is sudden and accidental. 



(Emphasis added). Thus, this added provision provides that damage caused by contaminants or
pollutants is excluded from policy coverage unless their introduction is "sudden and accidental." 
In such event, the damage comes within policy coverage as an exception to the exclusion.

 All of the liability insurance policies sold to Gulf Metals after it started doing
business with Stoller in 1977 exclude coverage for damage caused by contaminants or pollutants,
but all also contain the "sudden and accidental" pollution exception. However, none of the
policies at issue defines the phrase "sudden and accidental."

 Gulf Metals brought suit against CIC, seeking a declaration that the qualified
polluter's exclusion did not bar coverage for the environmental claims arising at the Stoller Site. 
Gulf Metals focused on the exception and argued that the word "sudden" can reasonably be
interpreted to mean "unexpected," so that the "sudden and accidental" exception to the pollution
exclusion would reinstate coverage as long as the underlying event was unexpected and unintended
from the standpoint of the insured. CIC moved for summary judgment, responding that "sudden"
necessarily contains a temporal element requiring that any discharge of pollutants be swift or
abrupt for the exception to the exclusion to apply. CIC claimed an affirmative defense that no
coverage existed because, under its interpretation, the zinc leakage at the Stoller Site was not
"sudden" in time. Gulf Metals also sought partial summary judgment that the "sudden and
accidental" exception did not constitute a valid affirmative defense for CIC. (3)

 The district court's final judgment incorporated earlier orders of the court ruling
that Gulf Metals had the burden of proving that the "sudden and accidental" exception did not bar
coverage, and declaring: 1) that there was neither patent nor latent ambiguity in the phase
"sudden and accidental"; 2) that the term "sudden," as used in the policy, contains a temporal
element; and 3) that the phrase "sudden and accidental" means "rapid and unexpected." The court
granted summary judgment to CIC on the basis that Gulf Metals could not meet its burden of
proving that the exclusion did not bar coverage. The district court also denied Gulf Metals'
motion for partial summary judgment.


DISCUSSION

 The standards for reviewing a motion for summary judgment are well established:
(1) the movant for summary judgment has the burden of showing that no genuine issue of material
fact exists and that it is entitled to judgment as a matter of law; (2) in deciding whether there is
a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant
will be taken as true; and (3) every reasonable inference must be indulged in favor of the
nonmovant and any doubts resolved in its favor. See Nixon v. Mr. Property Management Co., 690
S.W.2d 546, 548-49 (Tex. 1985). The function of summary judgment is not to deprive litigants
of the right to trial by jury, but to eliminate patently unmeritorious claims and defenses. See
Swilley v. Hughes, 488 S.W.2d 64, 68 (Tex. 1972).

 Insurance policies are contracts, and their construction is governed by the same
rules of construction applicable to all contracts. See Balandran v. Safeco Ins. Co. of Am., 972
S.W.2d 738, 740-41 (Tex. 1998); National Union Fire Ins. Co. v. CBI Indus., 907 S.W.2d 517,
520 (Tex. 1995). In construing an insurance contract, its terms are given their "ordinary and
generally accepted meaning." Security Mut. Cas. Co. v. Johnson, 584 S.W.2d 703, 704 (Tex.
1979). The primary goal of the court "is to give effect to the written expression of the parties'
intent." Balandran, 972 S.W.2d at 741 (emphasis added) (quoting State Farm Life Ins. Co. v.
Beaston, 907 S.W.2d 430, 433 (Tex. 1995) and Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132,
133 (Tex. 1994)). In construing a written contract, a court should "ascertain the intent of the
parties as expressed in the instrument." National Union, 907 S.W.2d at 520 (emphasis added)
(citing Forbau, 876 S.W.2d at 133). "If a written contract is so worded that it can be given a
definite or certain legal meaning, then it is not ambiguous." National Union, 907 S.W.2d at 520;
Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). However, if "the language of a policy or
contract is subject to two or more reasonable interpretations, it is ambiguous." National Union,
907 S.W.2d at 520; see also Balandran, 972 S.W.2d at 741. "Where an ambiguity involves an
exclusionary provision of an insurance policy, [courts] must adopt the construction . . . urged by
the insured as long as the construction is not unreasonable, even if the construction urged by the
insurer appears to be more reasonable or a more accurate reflection of the parties' intent." 
Balandran, 972 S.W.2d at 741 (quoting National Union Fire Ins. Co. v. Hudson Energy Co., 811
S.W.2d 552, 555 (Tex. 1991)).

 An ambiguity in a contract generally will fall into one of two categories: "patent"
or "latent." "A patent ambiguity is evident on the face of the contract." National Union, 907
S.W.2d at 520. "A latent ambiguity arises when a contract which is unambiguous on its face is
applied to the subject matter with which it deals and an ambiguity appears by reason of some
collateral matter." (4) Id.

 By its first three issues, Gulf Metals asserts that the district court erred in not
considering evidence of the circumstances surrounding the promulgation of the qualified polluter's
exclusion provision of the insurance policies at issue. This evidence, urges Gulf Metals, shows
that the intention of the drafters of the clause was that the exclusion only bar coverage for
intentional pollution and there are no material facts showing that the pollution at and around the
Stoller Site was expected or intended by Gulf Metals. Gulf Metals suggests that the policy terms
are "possibly ambiguous," and the evidence that the district court failed to consider would aid in
the interpretation of the exception asserted by Gulf Metals, that the discharge of pollutants need
not be rapid to trigger coverage in Gulf Metals' favor. We concur that there is no evidence that 
the pollution was either expected or intended by Gulf Metals. Thus, our inquiry is whether the
construction advanced by Gulf Metals of the phrase "sudden and accidental" as used in the
qualified polluter's exclusion clause is a reasonable interpretation. See Hudson Energy Co., 811
S.W.2d at 585 (citing Barnett v. Aetna Life Ins. Co., 723 S.W.2d 663, 666 (Tex. 1987)).


The Qualified Polluter's Exclusion Clause is not Patently Ambiguous

 The district court correctly held that "sudden and accidental" is not patently
ambiguous. In so doing, the court relied on Mustang Tractor & Equipment Co. v. Liberty Mutual
Insurance Co., 76 F.3d 89 (5th Cir. 1996). Mustang Tractor applied Texas law in interpreting
the pollution-exclusion clause of a general liability policy almost identical to the clause here. The
Mustang Tractor court, after applying Texas rules of contractual construction, reached an opposite
conclusion to that urged by Gulf Metals when analyzing "sudden" as joined with "accidental" to
form the phrase "sudden and accidental." The court reasoned that the use of both words together
reflected two separate requirements. Because "accidental" describes an unforeseen or unexpected
event, to ascribe the same meaning to "sudden" would render the terms redundant and violate the
rule that each word in a contract be given effect. The court stated that "sudden" therefore must
contain a temporal element meaning abrupt or brief.


Because Texas courts agree that "accidental" generally describes an unforeseen or
unexpected event, see e.g., Republic Nat'l. Life Ins. Co. v. Heyward, 536 S.W.2d
549, 554 (Tex. 1976), giving "sudden" the same meaning would violate the
requirement that we give each word effect. As one court has stated: "The very use
of the words 'sudden and accidental' . . . reveal a clear intent to define the words
differently, stating two separate requirements. Reading 'sudden' in its context,
i.e., joined by the word 'and' to the word 'accident,' the inescapable conclusion is
that 'sudden,' even if including the concept of unexpectedness, also adds and [sic]
additional element because 'unexpectedness' is already expressed by 'accident.' 
This additional element is the temporal meaning of sudden, i.e., abruptness or
brevity. To define sudden as meaning only unexpected or unintended, and
therefore as a mere restatement of accidental, would render the suddenness
requirement mere surplusage."



Mustang Tractor, 76 F.3d at 92 (quoting Northern Ins. Co. v. Aardvark Assoc., Inc., 942 F.2d
189, 192-93 (3d Cir. 1991)); (5) see also SnyderGeneral Corp. v. Century Indem. Co., 907 F. Supp.
991, 997 (N.D. Tex.), aff'd in part and vacated in part, 113 F.3d 536 (5th Cir. 1997).

 In its analysis, the Mustang Tractor court concluded that the context in which a
word is used must control its definition. See Mustang Tractor, 76 F.3d at 92. We find Mustang
Tractor's analysis persuasive and agree that contextual inquiry is the approach to follow here. 
Gulf Metals urges that a review of dictionaries reveals that definitions of the word "sudden" often
emphasize that the word contains an "unexpected" or "unforeseeable" element. (6) While
dictionaries may be helpful to the extent they set forth the ordinary, usual meaning of words, they
provide an inadequate test for ambiguity. To allow the existence of more than one dictionary
definition to be the sine qua non of ambiguity would eliminate contextual analysis of contractual
terms; any time a definition appeared in a dictionary of whatever credibility or usage, that
definition could be said to be "reasonable" and thus render many, if not most, words ambiguous. 
Dictionaries define words in the abstract, while courts must determine the meaning of terms in a
particular context, here a specific insurance policy. Dictionary definitions alone can therefore be
accorded little weight in determining ambiguity. The fact that different people reading different
dictionary definitions of the same word might reach different interpretations of that word does not
make each reading and interpretation reasonable. We agree with those courts holding that such
definitions provide no significant help in determining whether a term has two reasonable
meanings. See New Castle County v. Hartford Accident & Indem. Co., 933 F.2d 1162, 1193-94
(3rd Cir. 1991); Cyrus Plateau Mining Corp. v. Commonwealth Ins. Co., 972 F. Supp. 1379,
1384-85 (D. Utah 1997); In re Texas E. Transmission Corp. PCB Contamination Ins. Coverage
Litigation, 870 F. Supp. 1293, 1348 (E.D. Pa. 1992), aff'd on other grounds, 15 F.3d 1249 (3rd
Cir.), cert. denied, 115 S. Ct. 291 (1994). 

 Mustang Tractor did not employ a multiple-dictionary-definition test to determine
whether "sudden" was ambiguous. The court placed "sudden" in its correct contextual position
as part of the term "sudden and accidental," applied Texas rules of construction, and concluded
that "'[s]udden' may only reasonably be construed to mean quick or brief." Mustang Tractor, 76
F.3d at 92-93; see also Guaranty Nat'l Ins. Co. v. Vic Mfg. Co., 143 F.3d 192, 194 (5th Cir.
1998); Texas E. Transmission, 870 F. Supp. at 1350 ("[A] definition of 'sudden' which divorces
it from the meaning of 'swift' and 'abrupt' is an unreasonable and tortured interpretation and not
one which the Supreme Court of Texas is likely to adopt.").

 Until recently, no Texas state court had examined the qualified polluter's exclusion.
In Mesa Operating Co. v. California Union Insurance Co., No. 05-96-986-CV, slip op. at 81
(Tex. App.--Dallas Feb. 2, 1999, no pet. h.) (1999 WL 42027), the Fifth Court of Appeals,
relying on Mustang Tractor and SnyderGeneral, applied a contextual analysis to the same clause
that we consider here, and found that "common usage of the term 'sudden' includes a temporal
element." Mesa Operating, slip op. at 91 (1999 WL 42027 at *5). We agree. Without resort to
a reference work, it is difficult to think of a situation where, in a normal, common or ordinary
interchange, a person would use "sudden" without intending to impart a sense of immediacy. 

 Gulf Metals directs us to a number of judicial decisions supporting its interpretation
of "sudden" as meaning merely "unexpected," and thereby imparting no temporal element. 
Indeed a substantial number of courts nationwide have examined the construction of "sudden,"
but without reaching a consensus. (7) Gulf Metals proffers that this split in authority regarding the
meaning of "sudden" suggests that the term is ambiguous, thereby rendering its construction of
the qualified polluter's exclusion clause reasonable. We disagree. The presence of conflicting
judicial decisions is insufficient to create an ambiguity as a matter of law. See Mesa Operating,
slip op. at 92 (1999 WL 42027 at *6) (citing Union Pac. Resources Co. v. Aetna Cas. & Sur. Co.,
894 S.W.2d 401, 405 (Tex. App.--Fort Worth 1994, writ denied)). To hold otherwise would
unduly restrict the ability of courts to engage in meaningful contextual analyses of contract terms. 
Courts would no longer be free to reach their own conclusions regarding contract interpretation
once other courts had developed differing interpretations. See T.C. Bateson Const. Co. v.
Lumbermens Mut. Cas. Co., 784 S.W.2d 692, 698 (Tex. App.--Houston [14th Dist.] 1989, writ
denied).

 We hold that in the context of the comprehensive general liability policies under
examination in this case, the word "sudden" clearly and unambiguously imparts a sense of
temporal urgency, and is therefore not patently ambiguous.


The Circumstances Surrounding the Promulgation of the Policy Language Cannot be used to
Create an Ambiguity


 The lack of facial ambiguity in the insurance contracts before us does not end our
inquiry, because an ambiguity may appear by reason of a collateral matter. See National Union,
907 S.W.2d at 520. Gulf Metals asserts that prior to the inclusion of the qualified polluter's
exclusion clause in liability insurance policies, these policies clearly covered the gradual release
of contamination such as the release here. The insertion of the clause, according to Gulf Metals,
was not meant to change any existing coverage. CIC contends that the Texas State Board of
Insurance, (8) in approving the change in policy language, intended that claims for gradual pollution
not be covered, and that the purpose of the new exclusion was to ensure that occurrence-based
policies would not be construed by the courts to extend coverage to such claims.

 Gulf Metals argues that the supreme court's recent opinion in Balandran (9) allows
consideration of circumstances surrounding the promulgation of an insurance policy form when
determining the existence of an ambiguity. The district court, without the benefit of Balandran, (10)
correctly found that a difference in interpretation does not create a latent ambiguity that would
allow the introduction or discovery of evidence regarding the insurance industry's understanding
of the meaning of the clause at the time it was drafted.

 Balandran must be read in conjunction with National Union. (11) National Union
involved the issue of the breadth of "absolute pollution exclusions," namely provisions found in
certain policies of insurance that deny coverage for any damage caused by pollutants regardless
of why, how or when the pollutants were released. The procedural facts of National Union are
similar to those before us. When its insurers denied coverage for a pollution claim, an insured
brought suit against them. The insurers moved for summary judgment on the basis that the
"absolute pollution exclusions" in their polices precluded coverage as a matter of law; the insured
responded that the policies, by virtue of these exclusions, contained both patent and latent
ambiguities. The trial court granted the insurance companies' motions for summary judgment
before the insured had the opportunity to obtain any documents through discovery even though the
trial court did have before it certain insurance industry documents relating to testimony before the
State Board of Insurance. National Union, 907 S.W.2d at 519. The court of appeals reversed the
trial court's grant of summary judgment in favor of the insurers, holding that the trial court abused
its discretion when it rendered summary judgment before allowing discovery. Id. at 520. The
discovery sought by the insured was evidence that its insurers knew and approved of industry-wide
discussions concerning the breadth of the "absolute pollution exclusion" and understood that the
provision would not exclude coverage in certain situations. Id. at 520-21. The supreme court
reversed the court of appeals and affirmed the trial court.

 In relating the rules of construction applicable to a policy or contract, the supreme
court in National Union was careful to restrict when "surrounding circumstances" outside the four
corners of the policy could be considered. "Whether a contract is ambiguous is a question of law
for the court to decide by looking at the contract as a whole in light of the circumstances present
when the contract was entered." Id. at 520 (emphasis added) (citing Coker, 650 S.W.2d at 394
and R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518 (Tex. 1980)). 
However, the parties' interpretation of a contract can be considered only after the court has found
the contract to be ambiguous. Id. The supreme court held that the evidence sought to be
discovered was germane only to the parties' interpretation of the "absolute pollution exclusion." 
In reversing the court of appeals, the supreme court found that the discovery allowed by the court
of appeals gave the insured the "opportunity to discover parol evidence going to the parties'
intentions in order to create a latent ambiguity." National Union, 907 S.W.2d at 521. The
supreme court refused to allow such discovery.

 It is apparent that the "surrounding circumstances" that may be considered in
determining ambiguity are those surrounding the making of the contract, not those present when
a regulatory body promulgates the form of the contract:



The ambiguity must become evident when the contract is read in context of the
surrounding circumstances, not after parol evidence of intent is admitted to create
an ambiguity. Neither the court of appeals' opinion nor the parties' briefs have
raised any need for additional facts to apply the insurance policies to the subject
matter with which they deal. The facts relating to the accident, the release of
hydrofluoric acid as a result of that accident, and the personal injury and property
damage claims allegedly resulting from that release appear to be fully developed.
The surrounding circumstances present when the contract was entered into were
amply established for the purpose of determining whether an ambiguity exists in
this case on these facts.



Id. at 521.

 In the case before us, the facts relating to the release of pollutants into the soil and
groundwater at the Stoller Site and the alleged damage resulting from that release are likewise
fully developed. Nothing further is needed to determine whether the qualified polluter's exclusion
clause is ambiguous. No issue of the parties' intentions is present unless the policy is first
ambiguous. Id. at 521 n.5. 

 Gulf Metals misconstrues the breadth of Balandran. Balandran dealt with
contradictory language found within the policy itself. See Balandran, 972 S.W.2d at 742 n.3. The
Balandrans' home was insured pursuant to a contract of insurance contained in a policy form
promulgated by the State Board of Insurance. When their home suffered damage due to an
underground plumbing leak, the Balandrans filed a claim with their insurer. Their policy provided
two types of coverage. Coverage A insured the dwelling itself, while Coverage B insured personal
property. Coverage A provided protection for all risks of physical loss unless specifically
excluded in the exclusion section of the coverage. The insurer asserted one such exclusion, which
the Balandrans conceded would cover their loss if the exclusion applied. However, they argued
that language in Coverage B (the personal property section of the policy) created an exception to
the exclusion claimed by their insurer. The insurer argued that because the exception only
appeared in Coverage B, it applied only to personal property. The Balandrans contended that
because the exception made specific reference to the exclusion claimed by their insurer, it applied
to any loss, not just a personal-property loss. The supreme court discussed the general rules of
contract interpretation applicable to insurance policies and stated, "[a]pplying these rules, we
conclude that the exclusion repeal provision is subject to two reasonable interpretations, and is
therefore ambiguous." See id. at 741.

 Only after determining that the exclusion repeal provision was patently ambiguous
did the court turn to a consideration of the circumstances surrounding the promulgation of the
policy form. See id. The court concluded that these circumstances enforced the reasonableness
of the Balandrans' interpretation of the ambiguous language found in the policy. See id. The
court specifically stated that the circumstances surrounding the promulgation of the policy form
were not considered in determining the existence of an ambiguity, but "[b]ecause the Balandrans'
interpretation of the contract language is reasonable, an ambiguity exists on the face of the
policy." Id. at 742 n.3 (emphasis added). (12)

 Not every differing interpretation of an insurance policy creates an ambiguity.
Indeed, as observed by the supreme court, "Both the insured and the insurer are likely to take
conflicting views of coverage, but neither conflicting expectations nor disputation is sufficient to
create an ambiguity." Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 134 (Tex. 1994) 
(emphasis in original).

 We hold as a matter of law that "sudden and accidental" clearly and unambiguously
imparts a sense of temporal urgency requiring the release of pollutants to be swift, rapid, or abrupt
to trigger the exception to the qualified polluter's exclusion clause and afford Gulf Metals coverage
under the policies under consideration here. No ambiguity exists on the face of the policies issued
by CIC to Gulf Metals, and evidence of the circumstances surrounding the promulgation of the
form of those policies may not be considered to create a latent ambiguity. We therefore overrule
Gulf Metals first three issues. (13)


CONCLUSION

 The district court was correct in holding that the qualified polluter's exclusion bars
coverage for Gulf Metals' damage claims as a matter of law. We affirm the judgment of the
district court.



 

 Lee Yeakel, Justice

Before Justices Jones, B. A. Smith and Yeakel

Affirmed

Filed: May 13, 1999

Publish
1. Gulf Metals Industries, Inc. and Gulf Reduction Corporation are affiliated corporations; we
will use their own designation, "Gulf Metals," when we refer jointly to both entities.
2. Gulf Metals' third amended petition named twenty insurance companies, including Chicago
Insurance Company, as defendants in this lawsuit. The district court's final judgment granted
motions for summary judgment on behalf of numerous defendant insurance companies by name
and generally denied all other relief, thus disposing of Gulf Metals' claims against any other
insurers. Appellees in this Court were originally Chicago Insurance Company, Interstate Fire &
Casualty Company, Delta Lloyds Insurance Company of Texas, First State Insurance Company,
Insurance Company of North America, Continental Casualty Company, Transcontinental Insurance
Company,CNA Lloyds of Texas, Transportation Insurance Company, Fidelity & Casualty
Insurance Company of New York and Glen Falls Insurance Company. Chicago Insurance
Company and Interstate Fire & Casualty Company settled with Gulf Metals after this appeal was
filed and were subsequently dismissed from the suit. However, the style of the case remains Gulf
Metals Industries, Inc., et al. v. Chicago Insurance Company, et al. For convenience and clarity
we refer to the insurance company defendants, including those remaining as appellees, collectively
as "CIC."
3. Gulf Metals and CIC stipulate that Gulf Metals is unable to show that a rapid discharge,
dispersal, release or escape of contaminants or pollutants from their intended place or places of
containment at the Stoller Site was responsible for any or all of the pollution or pollution-related
damage.
4. The district court used this example from National Union: "[I]f a contract called for goods
to be delivered to 'the green house on Pecan Street,' and there were in fact two green houses on
the street, it would be latently ambiguous." National Union, 907 S.W.2d at 520 n.4.
5. Aardvark Associates, while construing "sudden and accidental," did so in the context of
Pennsylvania state law.
6. "[H]appening, coming, made, or done quickly, without warning, or unexpectedly; a sudden
attack." Random House Dictionary of the English Language 1900 (Stuart B. Flexner ed., 1987);
"Happening without previous notice or with very brief notice; coming or occurring unexpectedly;
unforeseen; unprepared for." Black's Law Dictionary 1432 (6th ed. 1990); "[H]appening or
coming unexpectedly." Webster's Ninth New Collegiate Dictionary 1178 (Frederick C. Mish ed.,
1988). 
7. Many of these cases are gathered in New Castle County v. Hartford Accident & Indemnity
Co., 933 F.2d 1162, 1195-96 n.60-61 (3rd Cir. 1991). The New Castle County court found these
cases almost evenly divided, with about half holding that a similar pollution exclusion clause
barred coverage, and the remainder holding that it did not. The court could "discern neither a
noticeable trend nor a majority position." New Castle County, 933 F.3d at 1195. Gulf Metals
notes that this division has remained basically unchanged since the New Castle County decision.
8. Now the Texas Department of Insurance. See Tex. Ins. Code Ann. art. 1.01A(c) (West
Supp. 1999). The change in title designation did not affect any actions taken by the State Board
of Insurance. See Act of June 6, 1991, 72d Leg., ch. 242, art. 13, § 13.01, 1991 Tex. Gen. Laws
939, 1133. 
9. Balandran v. Safeco Ins. Co. of Am., 972 S.W.2d 738 (Tex. 1998).
10. The district court rendered an order entitled "Order Interpreting 'Sudden and Accidental'
as used in the Subject Insurance Policies" on September 10, 1997, and incorporated this order by
reference in his "Final Judgment" rendered January 7, 1998. Balandran was decided July 3,
1998.
11. National Union Fire Ins. Co. v. CBI Indus., 907 S.W.2d 517 (Tex. 1995).
12. The dissent likewise misconstrues the breadth of Balandran and implies that Balandran has
overturned National Union's holding that ambiguity must be determined before parol evidence of
intent is considered. See Gulf Metals Indus., Inc. v. Chicago Ins. Co., No. 03-98-013-CV, slip
op. at 6 n.2 (Tex. App.--Austin May 13, 1999, no pet. h.) (Smith, J., dissenting). We disagree
and believe that National Union and Balandran are to be read in harmony.
13. In its final issue Gulf Metals argues that the district court improperly assigned to it the
burden of proving the exception to the qualified polluter's exclusion. Because we uphold the
district court's grant of summary judgment in favor of CIC, which held as a matter of law that the
qualified polluter's exclusion is unambiguous, we do not address this issue.



final judgment granted
motions for summary judgment on behalf of numerous defendant insurance companies by name
and generally denied all other relief, thus disposing of Gulf Metals' claims against any other
insurers. Appellees in this Court were originally Chicago Insurance Company, Interstate Fire &
Casualty Company, Delta Lloyds Insurance Company of Texas, First State Insurance Company,
Insurance Company of North America, Continental Casualty Company, Transcontinental Insurance
Company,CNA Lloyds of Texas, Transportation Insurance Company, Fidelity & Casualty
Insurance Company of New York and Glen Falls Insurance Company. Chicago Insurance
Company and Interstate Fire & Casualty Company settled with Gulf Metals after this appeal was
filed and were subsequently dismissed from the suit. However, the style of the case remains Gulf
Metals Industries, Inc., et al. v. Chicago Insurance Company, et al. For convenience and clarity
we refer to the insurance company defendants, including those remaining as appellees, collectively
as "CIC."
3. Gulf Metals and CIC stipulate that Gulf Metals is unable to show that a rapid discharge,
dispersal, release or escape of contaminants or pollutants from their intended place or places of
containment at the Stoller Site was responsible for any or all of the pollution or pollution-related
damage.
4. The district court used this example from National Union: "[I]f a contract called for goods
to be delivered to 'the green house on Pecan Street,' and there were in fact two green houses on
the street, it would be latently ambiguous." National Union, 907 S.W.2d at 520 n.4.
5. Aardvark Associates, while construing "sudden and accidental," did so in the context of
Pennsylvania state law.
6. "[H]appening, coming, made, or done quickly, without warning, or unexpectedly; a sudden
attack." Random House Dictionary of the English Language 1900 (Stuart B. Flexner ed., 1987);
"Happening without previous notice or with very brief notice; coming or occurring unexpectedly;
unforeseen; unprepared for." Black's Law Dictionary 1432 (6th ed. 1990); "[H]appening or
coming unexpectedly." Webster's Ninth New Collegiate Dictionary 1178 (Frederick C. Mish ed.,
1988). 
7. Many of these cases are gathered in New Castle County v. Hartford Accident & Indemnity
Co., 933 F.2d 1162, 1195-96 n.60-61 (3rd Cir. 1991). The New Castle County court found these
cases almost evenly divided, with about half holding that a similar pollution exclusion clause
barred coverage, and the remainder holding that it did not. The court could "discern neither a
noticeable trend nor a majority position." New Castle County, 933 F.3d at 1195. Gulf Metals
notes that this division has remained basically unchanged since the New Castle County decision.
8. Now the Texas Department of Insurance. See Tex. Ins. Code Ann. art. 1.01A(c) (West
Supp. 1999). The change in title designation did not affect any actions taken by the State Board
of Insurance. See Act of June 6, 1991, 72d Leg., ch. 242, art. 13, § 13.01, 1991 Tex. Gen. Laws
939, 1133. 
9. Balandran v. Safeco Ins. Co. of Am., 972 S.W.2d 738 (Tex. 1998).
10. The district court rendered an order entitled "Order Interpreting 'Sudden and Accidental'
as used in the Subject Insurance Policies" on September 10, 1997, and incorporated this order by
reference in his "Final Judgment" rendered January 7, 1998. Balandran was decided July 3,
1998.
11. National Union Fire Ins. Co. v. CBI Indus., 907 S.W.2d 517 (Tex. 1995).
12. The dissent likewise