17-3495-cv
*Valls v. Allstate Ins. Co.*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2018

No. 17-3495-cv

WILLIAM A. VALLS,
CHRISTINE C. VALLS,

*Plaintiffs-Appellants*,

v.

ALLSTATE INSURANCE COMPANY,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Connecticut

ARGUED: JANUARY 30, 2019
DECIDED: APRIL 2, 2019

Before: LEVAL, CABRANES, PARKER, *Circuit Judges*.

—————

This appeal arises from the multitude of lawsuits filed by Connecticut homeowners whose basement walls were likely constructed with defective concrete manufactured by the now-defunct J.J. Mottes Company—the so-called "crumbling concrete cases." Plaintiffs-Appellants William A. Valls and Christine C. Valls (the "Vallses") appeal from a September 28, 2017 judgment of the United States District Court for the District of Connecticut (Victor A. Bolden, *Judge*) granting the motion of Defendant-Appellee Allstate Insurance Company ("Allstate") to dismiss the Vallses' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). This case presents a single question: Whether the "collapse" provision in the instant Allstate homeowner's insurance policy affords coverage for basement walls that exhibit significant cracking but remain standing. We conclude that, unfortunate as the Vallses' circumstances may be, their policy terms do not afford coverage. Accordingly, we **AFFIRM** the District Court's September 28, 2017 judgment.

—————

> JEFFREY R. LINDEQUIST, Law Office of Michael D. Parker, Springfield, MA, *for Plaintiffs-Appellants*.
>
> RAYMOND T. DEMEO (Jessica A.R. Hamilton, *on the brief*), Robinson & Cole LLP, Hartford, CT, *for Defendant-Appellee*.

—————

PER CURIAM:

This appeal arises from the multitude of lawsuits filed by Connecticut homeowners whose basement walls were likely constructed with defective concrete manufactured by the now-defunct J.J. Mottes Company—the so-called "crumbling concrete cases." Plaintiffs-Appellants William A. Valls and Christine C. Valls (the "Vallses") appeal from a September 28, 2017 judgment of the United States District Court for the District of Connecticut (Victor A. Bolden, *Judge*) granting the motion of Defendant-Appellee Allstate Insurance Company ("Allstate") to dismiss the Vallses' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). This case presents a single question: Whether the "collapse" provision in the instant Allstate homeowner's insurance policy affords coverage for basement walls that exhibit significant cracking but remain standing. We conclude that, unfortunate as the Vallses' circumstances may be, their policy terms do not afford coverage. Accordingly, we **AFFIRM** the District Court's September 28, 2017 judgment.

## I.     BACKGROUND

The Vallses own a home in Coventry, Connecticut that is insured by Allstate. In October 2015, the Vallses noticed several horizontal and vertical cracks in their basement walls. While the degree of damage is disputed, it is not disputed that the basement walls remain standing. Accepting the facts plausibly alleged in the

3

complaint, the dispute is whether Allstate's homeowner's insurance Policy (the "Policy") covers the damage the Vallses have alleged.

The Vallses originally filed this action in state court, and Allstate timely removed the case to the District Court. The amended complaint principally asserts three causes of action against Allstate: (1) breach of contract based on Allstate's denial of coverage under the Policy; (2) breach of the implied covenant of good faith and fair dealing; and (3) unfair and deceptive practices in violation of the Connecticut Unfair Insurance Practices Act ("CUIPA"), as enforced through the Connecticut Unfair Trade Practices Act ("CUTPA").

The Policy is an "all-risk" policy that covers "sudden and accidental direct physical loss to property . . . except as limited or excluded in this policy."[1] The Policy generally excludes "[c]ollapse" from its all-risk coverage.[2] In a section entitled "Additional Protection," however, the Policy reinstates coverage for a limited class of collapses:

> We will cover:
>
> a) the entire collapse of a covered building structure;

---

[1] J.A. 27.

[2] *Id.* at 28.

b) the entire collapse of part of a covered building structure; and

c) direct physical loss to covered property caused by (a) or (b) above.

For coverage to apply, the collapse of a building structure specified in (a) or (b) above must be a sudden and accidental direct physical loss caused by one or more of the following: . . .

b) hidden decay of the building structure; . . .

f) defective methods or materials used in construction, repair, remodeling or renovation.

Collapse does not include settling, cracking, shrinking, bulging or expansion.[3]

The sole issue on appeal is whether the gradual deterioration of the Vallses' still-standing basement walls constitutes a covered "collapse" under this provision of the Policy.

## II.     CERTIFICATION

Because this case depends on Connecticut state law, and a large number of Connecticut homes covered by homeowners' policies

---

[3] *Id.* at 36 (emphasis omitted).

appear to be similarly affected by defective concrete foundations, we contemplated certifying the question of coverage to the Connecticut Supreme Court. At oral argument, we asked the parties whether they were amenable to certification. Allstate, the out-of-state party in this diversity case, strenuously objected to certification. For the reasons that follow, we decline to certify.

Under the rules of this Court and Connecticut law, we may certify a question to the Connecticut Supreme Court "if the answer may be determinative of an issue" in a pending case before us "and if there is no controlling appellate decision, constitutional provision or statute."[4] "Certification is a discretionary device, both for the certifying court and for the court requested to answer the certified question[s]."[5]

There is much to be said in favor of certification in such a case. The issue is, of course, one of Connecticut law. Without the guidance of the Connecticut Supreme Court, we can have no assurance that our resolution will correspond to what the Connecticut Supreme Court would or will eventually decide. In a diversity case, we sit in some sense as an intermediate appellate court of the state, but our rulings on an issue of state law are not reviewable by the highest court of the state. As a result, we risk that "the party who lost in federal court has been unjustly denied her state-law rights," without any "means of effective

---

[4] *See* Conn. Gen. Stat. § 51-199b(d); 2d Cir. Local R. 27.2.

[5] *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 51 (2d Cir. 1992).

redress."[6] Our decision, if based on the Connecticut Supreme Court's answer to a certified question, might effectively resolve numerous pending state court cases, while our decision without guidance from the Connecticut Supreme Court will give little or no meaningful instruction to how Connecticut's Supreme Court will rule on the many pending cases. Moreover, certification by federal courts may serve principles of comity and federalism by deferring to state courts to decide on state law issues, especially where policy concerns of particular importance in the state are at stake.

On the other hand, as courts have recognized, certification has significant potential detriments for the parties, many of which are present in this case. It increases, at times enormously, the expenses incurred by the parties, as it requires at least two additional rounds of appellate review.[7] Certification also inevitably delays the resolution of the case, sometimes for well more than a year. In cases involving modest amounts at stake, the expense added by certification can exceed the amount in contention, and, depending on the circumstances, the attendant delays may also be unjustifiably burdensome.[8] For example, in a case such as this that involves an

[6] *McCarthy v. Olin Corp.*, 119 F.3d 148, 159 (2d Cir. 1997) (Calabresi, J., dissenting).

[7] *See also Brown v. Argosy Gaming Co.*, 384 F.3d 413, 417 (7th Cir. 2004) (noting the Seventh Circuit's "hesitancy to utilize the certification process with its incumbent costs to the litigants and the state court system").

[8] *See Tunick v. Safir*, 209 F.3d 67, 78-79 (2d Cir. 2000) (noting the delay and expense associated with certification); *see also id.* at 95 (Sack, J., concurring) (objecting to certification because it would postpone the plaintiff's speech, but

7

individual homeowner's insurance claim, the added litigation costs of certification may effectively nullify a significant portion of the plaintiffs' potential recovery, or even exceed the value of the claim.

In addition, while our Court has at times underlined the value of certification to our federal system, in that the device helps to realize the federalist objective of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), significant federalism interests can also cut *against* certification. In diversity cases, certification can effectively defeat a litigant's constitutionally endorsed entitlement to have its case adjudicated by a federal court rather than a state court, as certification will often effectively empower the state court to determine the outcome.[9] Where the out-of-state litigant removes a dispute against an in-state litigant to federal court (or originates the suit in federal court), certification nevertheless returns that litigant to state court, potentially nullifying the right of access to the federal court.[10] That right of access to federal courts in diversity cases, expressly authorized by Article III of the Constitution and the Judiciary Act of 1789 enacted by the first Congress (now provided by 28 U.S.C. § 1332), is a meaningful part of our federal structure. Here, Allstate, the out-of-state litigant, removed to federal court and, upon

---

reluctantly concurring in certification as preferable to a stalemate without a majority).

[9] *See Corsair Special Situations Fund, L.P. v. Pesiri*, 863 F.3d 176, 184 (2d Cir. 2017) (Leval, J., concurring).

[10] *See id.*

our inquiry whether it consented to certification, objected emphatically. Under these circumstances, Allstate as a foreign party has a constitutionally-recognized interest in not being put back in state court through the process of certification, an interest which is entitled to significant weight in a federal court's decision whether to certify.[11]

We recognize that in certain unusual circumstances, the arguments favoring certification may be strong notwithstanding objection by a party. For example, some "state law questions only arise in disputes governed exclusively by federal law, such as bankruptcy or copyright," such that "unless there is certification, the state courts [would be] substantially deprived of the opportunity to define state law."[12] And some cases involve a question of state statutory interpretation antecedent to a federal constitutional issue, which would raise the possibility of federal court abstention under the *Pullman* doctrine.[13] The Supreme Court has explained that certification is particularly appropriate in that context because, absent certification, (1) a federal court's application of the canon of constitutional avoidance to a state statute is especially likely to create "friction-generating error" between its interpretation and that of state

---

[11] *See id.* (noting that this concern on behalf of the out-of-state litigant was not worrisome in that case "because, when the possibility of certification was presented to the parties, neither side objected").

[12] *Gutierrez v. Smith*, 702 F.3d 103, 116 (2d Cir. 2012).

[13] *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941).

courts, and (2) federal courts might unnecessarily or prematurely decide on constitutional issues that might be avoided by a state court's interpretation of the statute.[14] Moreover, the Court explained, although the certification process may entail added cost and delay, that cost and delay are typically lower than that associated with the process of abstention, rendering certification an appealing alterative.[15]

These cases, however, raise no such special circumstances. Notwithstanding the potential benefits of certification, its inevitable burdens on the parties relating to cost and delay and its consequence for a party exercising its right to have a diversity case decided by a federal court weighs against certification when the parties do not unanimously consent. For these reasons, we have concluded that certification to the Supreme Court of Connecticut is not appropriate in this case.

## III. DISCUSSION

There is no dispute that Connecticut law governs our interpretation of the Policy. Connecticut courts interpret an insurance policy "by the same general rules that govern the construction of any written contract"—that is, by "look[ing] at the contract as a whole, consider[ing] all relevant portions together and, if possible, giv[ing]

---

[14] *See Tunick*, 209 F.3d at 75-76 (citing *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997)).

[15] *See Arizonans*, 520 U.S. at 79.

operative effect to every provision in order to reach a reasonable overall result."[16] If the policy's terms are "clear and unambiguous," then that language "must be accorded its natural and ordinary meaning."[17] Any ambiguities in the policy are "construed in favor of the insured because the insurance company drafted the policy."[18]

The Vallses contend that our interpretation of the Policy's collapse provision should be governed by *Beach v. Middlesex Mutual Assurance Co.*, 205 Conn. 246 (1987). But the insurance policy analyzed in *Beach* is easily distinguished. Unlike the Allstate Policy, the policy in *Beach* did not define or otherwise qualify the term "collapse." Indeed, it was the absence of such clarifying language that rendered the term "collapse" ambiguous in the *Beach* policy. Based on this ambiguity, the court in *Beach* concluded that the term "collapse," left undefined, encompasses "substantial impairment of the structural integrity of a building."[19] Here, by contrast, Allstate has expressly circumscribed the definition of "collapse" in its Policy with several qualifying terms. For example, Allstate's Policy requires that such collapses be "entire," "sudden," and "accidental."

---

[16] *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 311 Conn. 29, 37-38 (2014) (internal quotation marks omitted).

[17] *Id.* at 38 (internal quotation marks omitted).

[18] *Id.* (internal quotation marks omitted).

[19] *Beach*, 205 Conn. at 253; *see also id.* at 251 ("If the defendant wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it had the opportunity expressly to define the term to provide for the limited usage it now claims to have intended.").

11

We now turn to the limiting effect of the terms "sudden and accidental" and "entire collapse" within the Policy. The phrase "sudden and accidental" in the Policy[20] requires that the collapse in question occur both abruptly and unexpectedly. As the Connecticut Supreme Court has observed:

> Reading "sudden" in its context, i.e. joined by the word "and" to the word "accident," the inescapable conclusion is that "sudden," even if including the concept of unexpectedness, also adds an additional element because unexpectedness is already expressed by "accidental." This additional element is the temporal meaning of "sudden," i.e. abruptness or brevity.[21]

Here, the gradual erosion and cracking of the basement walls was not sudden. Thus, the inclusion of the words "sudden and accidental" in the collapse provision is sufficient to bar coverage under the Policy for the damage sustained to the Vallses' basement walls.

---

[20] J.A. 36.

[21] *Buell Indus., Inc. v. Greater New York Mut. Ins. Co.*, 259 Conn. 527, 540-41 (2002) (quotation marks added) (internal ellipsis and brackets omitted) (quoting *Mustang Tractor & Equip. Co. v. Liberty Mut. Ins. Co.*, 76 F.3d 89, 92 (5th Cir. 1996)) (interpreting the terms "sudden and accidental" in a pollution exclusion clause).

Because any alleged collapse here was not "sudden," it follows that the damage to the Vallses' walls is not covered by the Policy. But even if such cracking could be said to have occurred suddenly or accidentally, the Vallses' claim is still barred because the damage sustained to their basement walls cannot be deemed an *entire* collapse."[22] Whatever the term "entire collapse" encompasses, it must entail more than mere "cracking," since cracking is expressly excluded under the Policy's provision that "[c]ollapse does not include settling, cracking, shrinking, bulging or expansion."[23]

*　　*　　*

The Vallses claim that it is inconsistent to interpret the term "sudden" as imposing an abruptness requirement when several of the Policy's enumerated causes of collapse—including "hidden decay"— occur gradually. But this argument is unavailing, since physical collapse can occur abruptly even if the underlying cause proceeds slowly. One district court has helpfully illustrated the distinction as follows:

> There's termites in the house. No collapse.
> They're eating away; every day they're
> eating away. No collapse. They keep eating

---

[22] J.A. 36 (emphasis added).

[23] *See id.*

away. Finally, they eat enough that the beam fails. . . . Now there's coverage. Now you have a collapse or falling in. The fact that it was caused by termites and it was a slow process doesn't mean you didn't have an abrupt collapse. You did, when the beam failed and there was literally a falling of the beam, a failure of the beam.[24]

While the concrete in the Vallses' basement walls may be gradually deteriorating, there has been no sudden entire collapse, and there is no coverage for gradual decay unless it has caused such a collapse. Accordingly, the Vallses' claim was properly excluded under the Policy.

We conclude that the horizontal and vertical cracking in the Vallses' basement walls does not constitute a covered "collapse" under the Policy. Accordingly, Allstate did not breach its contract by denying coverage for the Vallses' claim. And because Allstate did not breach its contract, the Vallses' bad faith and CUTPA/CUIPA claims necessarily fail.[25]

---

[24] *Agosti v. Merrimack Mut. Fire Ins. Co.*, 279 F. Supp. 3d 370, 378 (D. Conn. 2017) (Underhill, J.) (internal quotation marks omitted).

[25] *See Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 798 (2013) ("[B]ad faith is not actionable apart from a wrongful denial of a benefit."); *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 378 (2008) ("Because we have concluded that the [insurer's] interpretation of the policy's coverage limitation was correct, there can be no genuine issue of material fact as to whether the application of that

## IV. CONCLUSION

To summarize: We hold that the "collapse" provision in the Allstate homeowner's insurance policy at issue here does not afford coverage for basement walls that exhibit signs of deterioration but that have not collapsed suddenly, accidentally, and entirely, as required by the Policy. For the foregoing reasons, we **AFFIRM** the District Court's September 28, 2017 judgment dismissing the Vallses' amended complaint for failure to state a claim.

interpretation as a general business practice constituted oppressive, unethical or unscrupulous conduct in violation of [CUTPA/CUIPA].").

15