20-111
*Mujo v. Jani-King International, Inc.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
August Term, 2020

(Argued: June 2, 2021                    Decided: September 9, 2021)

Docket No. 20-111

_____

SIMON MUJO and INDRIT MUHARREMI, on behalf of themselves and all others
similarly situated,

*Plaintiffs-Appellants*,

–v.–

JANI-KING INTERNATIONAL, INC., JANI-KING INC., and JANI-KING OF HARTFORD,
INC.,

*Defendants-Appellees*.

_____

Before:      CALABRESI and MENASHI, *Circuit Judges*, and COTE, *District Judge*.[*]
_____

Appellants brought a class action on behalf of Connecticut-based franchisees, in which they allege that their franchise agreement misclassifies franchisees as independent contractors rather than employees.  As employees, they reason, the collection of franchise fees violates the Connecticut Minimum Wage Act, Conn. Gen. Stat. § 31-71e, and the Connecticut anti-kickback statute, Conn. Gen. Stat. § 31-73.

_____

[*]      Judge Denise Cote, United States District Judge for the Southern District of New York, sitting by designation.

The United States District Court for the District of Connecticut (Bolden, *J.*) dismissed the Connecticut Minimum Wage Act claim and after discovery granted a motion for summary judgment on the anti-kickback claim. In resolving both motions, the district court concluded that even if the franchisees qualified as employees under Connecticut law, the franchisor was permitted to collect the franchise fees required by the franchise agreement. We AFFIRM.

JUDGE CALABRESI dissents from the Court's opinion, and files a dissenting opinion.

> SHANNON LISS-RIORDAN (Richard Hayber, *on the brief*), Lichten & Liss-Riordan, P.C., Boston, MA, *for plaintiffs-appellants*.
>
> AARON D. VAN OORT (Kerry L. Bundy, Larry E. LaTarte, *on the brief*), Faegre Drinker Biddle & Reath, LLP, Minneapolis, MN, *for defendants-appellees*.

COTE, *District Judge*:

Defendants-Appellees Jani-King International, Inc., Jani-King, Inc., and Jani-King of Hartford, Inc. ("Jani-King") are franchisors of commercial cleaning services. Jani-King requires its franchisees to pay a fee to acquire a Jani-King franchise. Its customers then pay Jani-King for cleaning services provided by its franchisees, and Jani-King deducts other fees from the payments made by customers before it pays its franchisees. Plaintiffs-Appellants Simon Mujo and Indrit Muharremi ("Appellants") sued Jani-King on behalf of a class of current and

former Jani-King franchisees in Connecticut, alleging that this arrangement violated Connecticut law.

The Appellants contend that Jani-King misclassified its franchisees as independent contractors rather than employees of Jani-King. As employees, they contend that Jani-King's deductions from customer revenue were made in violation of the Connecticut Minimum Wage Act, Conn. Gen. Stat. § 31-71e, and that Jani-King's collection of franchise fees unjustly enriched Jani-King. Connecticut's anti-kickback statute, Conn. Gen. Stat. § 31-73, prohibits an employer from charging an employee fees as a condition of securing or continuing in employment, and the Appellants reason that Jani-King was unjustly enriched by collecting fees in violation of this statute. The district court (Bolden, *J.*) granted Jani-King's motion to dismiss the Appellants' Minimum Wage Act claim and, after discovery, granted Jani-King's motion for summary judgment on the Appellants' unjust enrichment claim. For the following reasons, we affirm the judgment of the district court.

## BACKGROUND

Jani-King is a national provider of commercial cleaning services that operates using a franchise model. Jani-King markets its cleaning services and contracts with customers to provide cleaning services in accordance with terms negotiated between Jani-King and its customers. Customers remit payment for the

3

cleaning services to Jani-King. Under its franchise model, prospective franchisees initiate a business relationship with Jani-King by entering into a franchise agreement. Franchisees are assigned to service Jani-King's customers. Although a franchisee may choose to decline a customer offered by Jani-King, if a franchisee accepts a customer, it must accept the terms of the customer contract as negotiated by Jani-King. Jani-King deducts certain fees as agreed upon in each franchisee's agreement with Jani-King and remits the remainder of a customer's payments to the franchisee.

When servicing Jani-King customers, franchisees are required to comply with Jani-King's brand standards, which include the use of certain cleaning protocols and techniques specified by Jani-King. Franchisees and their work product are subject to inspection, and franchisees who do not pass muster may be subject to additional training or termination of their franchises. A Jani-King franchisee, however, is not obligated to perform assigned cleaning jobs herself: she may hire employees to perform the duties the franchisee agrees to accept from Jani-King. Franchisees may also trade customers with other Jani-King franchisees and may set their own work hours, subject to customer requirements. Finally, franchisees may sell their franchises to third parties, subject to certain conditions.

In order to acquire a Jani-King franchise and take on customers, a prospective franchisee must pay an initial franchise fee down payment and a

finder's fee for each customer. Jani-King franchisees are also required to pay additional fees over the course of the franchise relationship. Jani-King collects these fees by deducting them from the revenue it receives from customers. The deducted fees include accounting fees, royalty fees, advertising fees, and insurance fees. All of the deducted fees are prescribed in the Jani-King franchise agreement.

The Appellants are Connecticut-based Jani-King franchisees. Appellant Simon Mujo was a Jani-King franchisee from 2007 to 2016. He paid $44,175 in initial fees to Jani-King in 2007 and paid other fees over the course of his franchise agreement. Appellant Indrit Muharremi is a current Jani-King franchisee. He paid $16,250 in initial fees at the commencement of his franchisee relationship with Jani-King in 2014, and Jani-King has continued to deduct other fees from its payments to Muharremi over the course of the franchise relationship.

On December 5, 2016, the Appellants filed a class action complaint in the District of Connecticut, and on February 9, 2017, the Appellants filed an Amended Complaint that pleaded Connecticut Minimum Wage Act and unjust enrichment claims. Jani-King moved to dismiss the Amended Complaint in its entirety on March 30, 2017. On March 31, 2018, the district court granted Jani-King's motion to dismiss the Connecticut Minimum Wage Act claim but denied Jani-King's motion to dismiss the unjust enrichment claim. *Mujo v. Jani-King Int'l, Inc.*, 307 F. Supp. 3d 38 (D. Conn. 2018). The Appellants then moved to certify a class, and

5

on January 9, 2019, the district court granted the motion for class certification.  On June 10, Jani-King moved for summary judgment on the remaining unjust enrichment claim, and on July 15, the Appellants filed a cross-motion for summary judgment.  In an opinion of December 21, 2019, the district court granted Jani-King's motion for summary judgment.  *Mujo v. Jani-King Int'l, Inc.*, 431 F. Supp. 3d 18 (D. Conn. 2019).   This appeal followed.

## DISCUSSION

The Appellants challenge both the district court's 2018 opinion granting Jani-King's motion to dismiss their Connecticut Minimum Wage Act claim and the district court's 2019 opinion granting summary judgment to Jani-King on the Appellants' unjust enrichment claim.  "We review a grant of summary judgment *de novo*, and in so doing, we construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 148 (2d Cir. 2021).  A district court decision granting a motion to dismiss is also reviewed *de novo*, with all factual allegations in a complaint accepted as true and all reasonable inferences drawn in favor of the plaintiff.  *City of New York v. Chevron Corp.*, 993 F.3d 81, 89 (2d Cir. 2021).

## 1. Legal Framework

Under Connecticut law, "[s]ervice performed by an individual shall be deemed to be employment"[1] and therefore subject to provisions of Connecticut law governing the employer-employee relationship "unless and until it is shown" that

> (I) such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact; and (II) such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and (III) such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Conn. Gen. Stat. § 31-222(a)(1)(B)(ii). This provision is commonly called the "ABC test," and "unless the party claiming the exception to the rule that service is employment shows that all three prongs of the [ABC] test have been met, an employment relationship will be found." *Sw. Appraisal Grp., LLC v. Adm'r, Unemployment Comp. Act*, 155 A.3d 738, 745 (Conn. 2017) (citation omitted).

When an economic relationship qualifies as employment under the ABC test, Connecticut law subjects an employer to a number of regulations. Two of

---

[1] Connecticut law also creates several exceptions to this general principle, under which certain categories of services do not qualify as "employment." *See, e.g.,* Conn. Gen. Stat. § 31-222(a)(1)(E) (excluding, *inter alia*, services performed by prisoners, elected officials, and ministers from the statutory definition of employment). None of the exceptions, however, applies to the services provided by the Appellants and the class members.

these regulations are relevant to the Appellants' claims. Under the Connecticut Minimum Wage Act,

> [n]o employer may withhold or divert any portion of an employee's wages unless (1) the employer is required or empowered to do so by state or federal law, or (2) the employer has written authorization from the employee for deductions on a form approved by the commissioner, or (3) the deductions are authorized by the employee, in writing, for [certain health care expenses], or (4) the deductions are for contributions attributable to automatic enrollment [in certain retirement plans organized under state or federal law], or (5) the employer is required under the law of another state to withhold income tax of such other state. . . .

Conn. Gen. Stat. § 31-71e. For the purpose of the Connecticut Minimum Wage Act, "wages" are defined as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation." Conn. Gen. Stat. § 31-71a(3). As interpreted by the Connecticut Supreme Court, this provision "provide[s] remedial protections for those cases in which the employer-employee wage agreement is violated." *Mytych v. May Dep't Stores Co.*, 793 A.2d 1068, 1072 (Conn. 2002). It "does not purport to define the wages due; it merely requires that those wages agreed to will not be withheld for any reason." *Id*.

Connecticut also maintains an anti-kickback law, which prohibits employers from "demand[ing], request[ing], receiv[ing] or exact[ing] any refund of wages . . . or deduct[ing] any part of the wages agreed to be paid, upon the representation or the understanding that such . . . fee . . . is necessary to secure employment or

continue in employment" and "requir[ing], request[ing] or demand[ing] that any person agree to make payment of any refund of wages . . . in order to obtain employment or continue in employment." Conn. Gen. Stat. § 31-73(b). The term "refund of wages" is defined as "[t]he return by an employee to his employer . . . any sum of money actually paid or owed to the employee in return for services performed" or "payment by the employer or his agent to an employee of wages at a rate less than that agreed to by the employee." Conn. Gen. Stat. § 31-73(a).

Connecticut law also permits franchise agreements and sets forth a statutory framework that governs the franchisor-franchisee relationship. Under the Connecticut Franchise Act, a "franchise" is

> an . . . arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor . . . and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate . . . .

Conn. Gen. Stat. § 42-133e.

If a franchise relationship exists under this statute, the franchisor is subject to certain obligations with respect to its franchisees. For instance, a franchisor must provide written notice to a franchisee before terminating or declining to renew the franchise relationship, Conn. Gen. Stat. § 42-133f(a), and a franchise must be awarded for a term of at least three years, Conn. Gen. Stat § 42-133f(d). A

9

franchisee has a private right of action to enforce the protections provided by the Connecticut Franchise Act. Conn. Gen. Stat. § 42-133g. But Connecticut law leaves the terms and conditions of the franchise fee to be decided by the parties to the franchise agreement: for instance, it does not cap franchise fees at a certain percentage of revenue.

Under Connecticut law, the ABC test for employee status and the Connecticut Franchise Act's test for franchisee status are independent of each other. Indeed, the Connecticut Appellate Court has held that an individual can be an employee under the ABC test if an application of the ABC test would deem that individual an employee, even if that same individual is also a franchisee. *See Jason Roberts, Inc. v. Administrator*, 15 A.3d 1145, 1150 (Conn. App. Ct. 2011). If an individual qualifies as both a franchisee and an employee, she would be entitled to the protections of both the Connecticut Franchise Act and the employment-related provisions of Connecticut law.

## 2. Connecticut Minimum Wage Act Claim

In the Amended Complaint, the Appellants alleged that Jani-King violated the Connecticut Minimum Wage Act by deducting fees from their compensation and that those fees did not fall into any of the categories of permissible wage

deductions enumerated in the Act.[2] Two well-established principles of Connecticut law bear on the Appellants' Connecticut Minimum Wage Act claim. First, under § 31-71e of the Connecticut Minimum Wage Act, "the employer-employee agreement, as opposed to a statutory formula, control[s] the manner in which wages are calculated." *Mytych*, 793 A.2d at 1072. The Act "does not purport to define the wages due; it merely requires that those wages agreed to will not be withheld for any reason." *Id*. This is because the "purpose of the statute[] . . . is to protect the sanctity of the wages earned by an employee pursuant to the agreement she or he has made with her or his employer," rather than "dictat[ing] the means by which those wages are calculated." *Id*. at 1073. Second, "there is a strong public policy in Connecticut favoring freedom of contract." *Geysen v. Securitas Sec. Servs. USA, Inc.*, 142 A.3d 227, 234 (Conn. 2016) (citation omitted). Therefore, "contracts voluntarily and fairly made should be held valid and enforced in the courts." *Id*. (citation omitted). This principle dictates that while courts may decline to enforce contracts in certain circumstances, such as when the

---

[2] In its opinion on Jani-King's motion to dismiss, the district court held that the Appellants had plausibly alleged they were Jani-King employees under Connecticut's ABC test, *Mujo v. Jani-King Int'l, Inc.*, 307 F. Supp. 3d 38, 48 (D. Conn. 2018), and on summary judgment, the district court found that there was a genuine dispute of material fact as to the Appellants' status as employees, *Mujo v. Jani-King Int'l, Inc.*, 431 F. Supp. 3d 18, 40 (D.Conn. 2019). On appeal, Jani-King argues that the undisputed evidence established that the Appellants were not employees under the ABC test, and that the district court erred in holding otherwise. We need not address the district court's reasoning regarding the Appellants' employee status because even assuming that the Appellants are employees under the ABC test, we conclude that the district court properly held that the Appellants failed to state a claim under the Connecticut Minimum Wage Act.

11

contract is in "violat[ion] of public policy," courts should not refrain from enforcing a contract simply because it reflects "bargains unwisely made." *Id*.

The district court correctly applied the principles set forth by the Connecticut Supreme Court in *Geysen* and *Mytych* in concluding that the Appellants failed to state a claim under the Connecticut Minimum Wage Act. It noted that the Jani-King franchise agreement expressly provides for the deductions challenged by the Appellants and defines franchisees' compensation as the funds remaining after the deductions are taken. As a result, the district court noted, the gross customer revenue received by Jani-King is not the baseline "wage" from which the Connecticut Minimum Wage Act prohibits deductions. Rather, even assuming that the Appellants are employees who receive wages subject to the Connecticut Minimum Wage Act, their wages under the franchise agreement are the funds that remain *after* Jani-King deducts its fees under the franchise agreement. "Connecticut law and the public policy of freedom of contract" therefore require enforcement of the parties' agreement. *Geysen*, 142 A.3d at 236.

The Appellants argue that the district court erred in dismissing their Connecticut Minimum Wage Act claim because their agreements with Jani-King misclassified them as independent contractors. As a result, the Appellants contend, the agreements could not comply with the preconditions for wage deductions set forth in § 31-71e, because the funds did not go to one of the enumerated uses set

12

forth in § 31-71e and Jani-King did not and could not have sought the written authorization from the Appellants necessary to withhold funds for a purpose not enumerated in § 31-71e.[3]  But even if the Appellants should have been classified as employees under Connecticut law, *Mytych* forecloses the Appellants' § 31-71e claim.  The *Mytych* plaintiffs, who were employed as sales representatives at retail stores in Connecticut, alleged that their employment agreements violated the Connecticut Minimum Wage Act, Conn. Gen. Stat. § 31-71e, because the agreements allowed their employer to deduct certain fees from sales commissions owed to the plaintiffs under their employment agreements.  793 A.2d at 1071.  The Connecticut Supreme Court rejected this argument, holding that § 31-71e provided only a remedy for deductions from wages made in violation of the employment agreement and did not prohibit employment agreements that excluded from wages certain revenue attributable to the employee's efforts.  *Id*. at 1074-75.

*Mytych* controls the outcome of this case.  The holding of *Mytych* applies consistently to both employees and contractors: indeed, in *Mytych*, the plaintiffs were indisputably employees of the defendants, and the Connecticut Supreme Court held that an employment contract that excluded from their wages a certain portion of the revenue attributable to their work did not violate § 31-71e.  Under

---

[3] Jani-King also contends that the franchise agreement itself served as the requisite written authorization under § 31-71e.  We need not address that issue because we conclude that § 31-71e does not apply to the deducted funds.

13

*Mytych*, then, Jani-King did not run afoul of § 31-71e with respect to the disputed funds even if the Appellants were employees. The Appellants have therefore failed to state a claim even if it were assumed that Jani-King misclassified the Appellants.

The Appellants also note that, while the Connecticut Supreme Court's decision in *Geysen* reflects a general principle that bargained-for employment contracts are enforced, it does not set forth a general rule requiring enforcement of employment contracts in all circumstances. Instead, *Geysen* affirms that provisions of employment contracts that violate public policy are void. Appellants argue that the provision of the franchise agreement that allows Jani-King to deduct franchise fees from the gross revenue received from the work of each franchisee is void as against public policy because § 31-71e of the Act does not authorize the deductions. [4]

---

[4] Appellants' theory implies that, in any franchise relationship in which the franchisor is responsible for collecting customer revenue before conveying it to the franchisee, the Connecticut Minimum Wage Act would preclude the franchisor from collecting nearly any franchise fee that does not fall into one of the permitted categories of wage deduction enumerated in the Act. This reading of the Connecticut Minimum Wage Act would *de facto* prohibit certain types of franchised businesses in Connecticut by rendering franchises economically non-viable. Given that Connecticut has enacted a comprehensive regulatory scheme for franchising that does not prohibit Jani-King's business model of deducting franchise fees from customer revenue before remitting payment to franchisees, it is implausible to read the Connecticut Minimum Wage Act as prohibiting Jani-King's implementation of the franchise business model. A legislature "does not . . . hide elephants in mouseholes." *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001).

14

It is true that, in *Geysen*, the Connecticut Supreme Court noted that provisions of employment contracts that "act[] to negate the wage statutes . . . violate[] public policy." 142 A.3d at 234. But the *wage* statutes apply only to *wages*, and Connecticut law "expressly leaves the determination of the wage to the employer-employee agreement." *Mytych*, 793 A.2d at 1074. Even assuming that the franchisees are employees who receive wages, the deducted fees are not wages under the statute. As noted above, § 31-71e is "not substantive" and "does not purport to define the wages due." *Id*. at 1072. Connecticut law allowed the franchisees and Jani-King to agree on a formula for calculation of compensation that excludes a portion of the gross franchise revenue from the franchisees' compensation.[5] *Id*. at 1075-76. Because the wage statutes do not apply to the portion of gross franchise revenue that the parties agreed is not part of the franchisees' compensation, the contract does not violate § 31-71e, and by extension does not violate public policy. We therefore lack the power to void the agreement and "to make a new and different agreement" between Jani-King and the franchisees. *Geysen*, 142 A.3d. at 234 (citation omitted).

---

[5] The Appellants do not assert that they were not paid the minimum hourly wage as defined by federal or Connecticut law.

### 3. Unjust Enrichment Claim

In their complaint, the Appellants alleged that Jani-King had been unjustly enriched because the fees it collected from them were illegal fees levied in exchange for employment in violation of the Connecticut anti-kickback statute, Conn. Gen. Stat. § 31-73(b).[6] Under Connecticut law, a plaintiff seeking to recover for unjust enrichment "must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Vertex, Inc. v. City of Waterbury*, 898 A.2d 178, 190 (Conn. 2006) (citation omitted). It is a "broad and flexible remedy," *id.*, and while the Connecticut Supreme Court has set out the aforementioned framework for assessing unjust enrichment claims, the ultimate question for courts in assessing unjust enrichment claims is whether, under a given set of circumstances, the "party liable, to the detriment of someone else, obtain[ed] something of value to which the party liable was not entitled?" *Town of New Hartford v. Conn. Res. Recovery Auth.*, 970 A.2d 592, 609 (Conn. 2009) (citation omitted). The district court correctly applied these principles, as well as those set

---

[6] Section 31-73(b) is a criminal statute that does not provide for a private right of action. In its ruling on Jani-King's motion to dismiss, the district court assumed that § 31-73(b) could nonetheless give rise to an unjust enrichment claim to the extent that an employer improperly exacts money from an employee in violation of the provision. We assume without deciding that § 31-73(b) may serve as a basis for an unjust enrichment claim, because even if it can, the district court correctly concluded that the unjust enrichment claim fails on its merits.

forth by the Connecticut Supreme Court in *Mytych* and *Geysen*, in granting Jani-King's motion for summary judgment.

As the district court explained, the gravamen of the Appellants' unjust enrichment claim is that Jani-King obtained something of value from the Appellants: their franchise fees. Jani-King allegedly received these valuable franchise fees in exchange for something of no value, a purported franchise right that is in fact an employment relationship contingent on payments that violate § 31-73(b). At least three principles of well-established Connecticut law preclude this unjust enrichment theory. First, as the district court noted, bona fide franchise agreements -- under which the franchisee receives the benefit of the franchisor's intellectual property and support services in exchange for franchise fees -- are expressly authorized by Connecticut law. *See* Conn. Gen. Stat § 42-133e. Second, Connecticut courts have held that, even if an individual qualifies as an employee under the ABC test, she may also be a franchisee. *See Jason Roberts,* 15 A.3d at 1150. An employee may therefore validly enter into a franchise agreement, pay franchise fees, and serve as a franchisee. As *Geysen* teaches, the "strong public policy in Connecticut" favors enforcement of a freely entered contract. 142 A.3d at 234. And as *Mytych* teaches, § 31-73 itself suggests that it is the contract, and not a statutory formula, that controls the manner in which wages are calculated. 793 A.2d at 1075-76. This is because while § 31-73(b) prohibits employers from

17

seeking a "refund of wages," § 31-73(a) defines "refund of wages" as "[t]he return by an employee to his employer . . . of any sum of money actually paid or owed to the employee in return for services performed," and "the sum of money . . . owed to the employee" is defined by the employment contract. Finally, an employee-franchisee may enter into a compensation agreement that defines her compensation as the portion of the gross revenue attributable to the employee-franchisee's work after franchise fees are subtracted. As we have explained in this Opinion, a compensation agreement with that structure does not violate the Connecticut Minimum Wage Act and is not void as against public policy.

As the district court noted, Appellants' unjust enrichment claim cannot survive a motion for summary judgment if they cannot muster some evidence that the Jani-King franchise agreement was not a bona fide franchise agreement, under which they received valuable services in exchange for their franchise fees. In order to survive Jani-King's motion for summary judgment, the Appellants were required to provide to the district court "hard evidence . . . from which a reasonable inference in [their] favor may be drawn," *Hayes v. Dahlke*, 976 F.3d 259, 267 (2d Cir. 2020) (citation omitted), that they did not receive valuable franchise rights in exchange for their franchise fees. The district court concluded that the Appellants had not provided the requisite "hard evidence," and we agree.

18

The Jani-King franchise agreement provided the Appellants with an alienable right to use Jani-King's intellectual property and systems in the course of operating a commercial cleaning business, and the Appellants mustered no evidence that these rights were illusory or lacked value. Accordingly, the district court properly granted summary judgment to Jani-King on the Appellants' unjust enrichment claim.

## 4. Motion for Certification

Finally, Appellants -- supported by our dissenting colleague -- move for an order certifying three questions of law to the Connecticut Supreme Court.[7] "Under the rules of this Court and Connecticut law, we may certify a question to the Connecticut Supreme Court 'if the answer may be determinative of an issue' pending in a case before us 'and if there is no controlling appellate decision,

---

[7] The proposed questions are:

1. Where workers are misclassified as independent contractors pursuant to the "ABC" test set forth in Conn. Gen. Stat. § 31-222, is it a violation of Connecticut law to require the workers to make payments they could not have been required to make if they had been properly classified as employees, such as payments for their own workers' compensation insurance or payments in order to obtain a job?

2. Where misclassified workers are actually employees of a franchisor, do "franchise fees" they must pay in order to obtain janitorial work qualify [as] unlawful payments for a job under Conn. Gen. Stat. § 31-73(b)?

3. Is a contract purporting to authorize deductions from a worker's pay binding and enforceable where the same contract purporting to authorize the deductions also misclassifies the worker as an independent contractor such that the worker may not realize the deductions would be unlawful deductions from wages under Conn. Gen. Stat. § 31-71(e)?

Plaintiff-Appellants' Mot. to Certify Questions of Law to the Conn. Sup. Ct. 1.

constitutional provision or statute.'" *Valls v. Allstate Ins. Co.*, 919 F.3d 739, 742 (2d Cir. 2019) (quoting Conn. Gen. Stat. § 51-199b). "Whether we ask a state court to resolve unsettled legal questions will depend on, among other factors: '(1) the absence of authoritative state court decisions; (2) the importance of the issue to the state, and (3) the capacity of certification to resolve the litigation.'" *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 388 (2d Cir. 2009). "[W]e do not certify a question of unsettled state law merely because state law permits it." *Id.* Rather, "[w]e resort to certification sparingly, mindful that it is our job to predict how the [Connecticut Supreme Court] would decide the issues before us." *Highland Capital Mgmt., LP v. Schneider*, 460 F.3d 308, 316 (2d Cir. 2006) (citation omitted).

The Appellants' proposed questions do not warrant certification under these principles. First, the proposed questions have already been answered by the "authoritative state court decisions" of *Mytych* and *Geysen*. *Runner*, 568 F.3d at 388. These cases stand for the uncontroversial proposition that an employee and employer may enter into an employment contract that defines the employee's wages as some sum of money less than the gross revenue received by her employer as a result of her labor. Indeed, this is how most employee compensation agreements are structured in practice and, in fact, must be structured in practice. Every business has numerous expenses other than employee compensation, and it

20

must be able to pay those expenses to remain a going concern. It is implausible that, as a matter of Connecticut state law, an employer is required to pay an employee every penny of revenue attributable to the employee's efforts.

The franchise agreement is in line with these common-sense principles at the root of *Mytych* and *Geysen*. Appellants provide services to Jani-King's customers; Jani-King's customers pay Jani-King; and Jani-King, in accordance with the bargained-for franchise agreement, uses some of that customer revenue to pay defined business expenses and some of that customer revenue to compensate the Appellants for their labor. This is not a novel arrangement: it is how all businesses operate. And, most importantly, the Connecticut Supreme Court has affirmed in *Mytych* and *Geysen* that this ubiquitous arrangement does not violate the Connecticut employment statutes at issue in this case. We therefore can confidently "predict how the [Connecticut Supreme Court] would decide the issues before us," *Schneider*, 460 F.3d at 316, obviating the need for certification.

In response to this reasoning, the dissent claims that a threshold question is whether under Connecticut law the Appellants are properly understood as employees, franchisees, or a hybrid of the two, and contends that we err in failing to certify to the Connecticut Supreme Court to address that issue. Not so: that question is irrelevant to the outcome of this case, because the Appellants cannot succeed on their claims under any of these three scenarios. Even if the Appellants

21

are properly understood as employees under Connecticut law, their claims are foreclosed by *Mytych*.[8]  If Connecticut law defines the Appellants as franchisees and not employees, they are entitled only to the protections of the Connecticut Franchise Act, and not to the provisions of Connecticut employment law under which they bring suit.  And if the defendants are both employees and franchisees, they can conceivably have only the protections of the Connecticut employment laws, as interpreted in *Mytych*, and of the Connecticut Franchise Act.  There is no reason to believe that Connecticut law could entitle employee-franchisees, by virtue of their dual status, to some legal right beyond those provided to either employees or franchisees.  Under any of those three frameworks, then, the defendants prevail.

For this reason, the dissent's reliance on a recent certification decision of the First Circuit is misplaced.  In *Patel v. 7-Eleven, Inc*, No. 20-1999, 2021 WL 3486175 (1st Cir. Aug. 9, 2021), the plaintiff franchisees brought a suit under Massachusetts' employment statutes against the defendant franchisor, and the

---

[8] The dissent also notes that there is no Connecticut authority affirmatively holding that the ABC test applies to determine whether an individual is an employee for the purposes of the anti-kickback statute and contends that certification is necessary to allow the Connecticut Supreme Court to make that determination in the first instance.  But this issue is irrelevant to the outcome here.  If the Appellants are employees as defined in the anti-kickback statute -- regardless of whether the statute incorporates the ABC test or some other test for employee status -- *Mytych* still forecloses their claims.  And if the Appellants are not employees under the anti-kickback statute, then they cannot invoke its provisions at all, because the anti-kickback statute prohibits only the exaction of kickbacks from "employees" in exchange for "employment."  Conn. Gen. Stat. § 31-73.

defendant franchisor claimed that it could not comply with both certain provisions of Massachusetts employment law and a Federal Trade Commission regulation governing franchising. On appeal, the First Circuit certified to the Massachusetts Supreme Judicial Court a question of whether a certain provision of Massachusetts employment law should be construed to cover franchisor-franchisee relationships governed by that federal regulation. But here, the outcome-determinative issue is not whether the Connecticut employment statutes apply to the relationship between the Appellants and Jani-King: it is whether those statutes prohibit the method provided under the franchise agreement for calculating the Appellants' compensation. For the reasons we have discussed, the Connecticut Supreme Court in *Mytych* authoritatively determined that they do not.

Further, certification would not "resolve the litigation," *Runner*, 568 F.3d at 388, because the Appellants' proposed questions for certification all presuppose that Appellants were in fact employees of Jani-King, an issue not yet decided in this litigation. Favorable answers for the Appellants on the proposed questions from the Connecticut Supreme Court would therefore not dispose of this case because further fact-finding through litigation would be required to determine the Appellants' employment status. *See Compassionate Care, Inc. v. Travelers Indem. Co.*, 83 A.3d 647, 654 (Conn. App. Ct. 2013) ("The determination of the status of an individual as an independent contractor or an employee . . . is a question of

23

fact."). And, most significantly, even if further litigation established that the Appellants were employees, Jani-King would still prevail: in *Mytych*, the Connecticut Supreme Court held that a similar compensation scheme did not violate Connecticut law even where there was no dispute that the plaintiffs were employees of the defendant. For these reasons, we deny Appellants' motion to certify the proposed questions of law to the Connecticut Supreme Court.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

GUIDO CALABRESI, *Circuit Judge,* dissenting:

Simon Mujo and Indrit Muharremi worked for Jani-King as cleaners. They paid tens of thousands of dollars to Jani-King in initial fees to obtain work: Mr. Mujo paid $44,175, and Mr. Muharremi paid $16,250. By the terms of the labor contracts they signed, which are styled as franchise agreements, the size of the initial fee determines how much work the cleaner will receive. Once work began, Jani-King deducted much of their monthly income for a variety of post-work fees, including "finder's fees," insurance payments, supply costs, and "charge-backs." According to their Amended Complaint, for example, Mr. Muharremi earned $4,508.72 for the month of September 2016. After royalty fees, accounting fees, technology fees, a "finder's fee," an advertising fee, a lease fee, franchise supply costs, and over $1,000 in "charge-backs," his gross income for the month was reduced to $1,746.80. In July of 2015, Mr. Mujo's earnings of $ 1,403.83 similarly were reduced to a gross income of $310.45. Jani-King argues that these are all permissible fees pursuant to a legitimate franchise agreement.

Appellants compare the system to indentured servitude. They pay so much money up front, and have so much of their wages deducted for fees, that they are obliged to keep working simply to earn back the money they paid to get

1

the jobs in the first place. They claim that they are employees whom Jani-King intentionally misclassified as independent contractors in order to evade Connecticut labor laws. Specifically, they argue that the initial fees violate Connecticut's anti-kickback statute, Conn. Gen. Stat. § 31-73(b), and that the post-work fees violate the state's minimum wage law, Conn. Gen. Stat. § 31-71e.

We cannot resolve this dispute without knowing whether appellants in fact properly qualify as independent contractors, franchisees, employees, or as a "dual status" combination of employees and franchisees at the same time. In other words, we first need to know how Connecticut classifies workers in the employment statutes under which appellants bring their claims. But when we read the relevant pages of the Connecticut General Statutes and the Connecticut Reports, no answers appear. The Connecticut Supreme Court has not addressed these questions, and cases in the lower Connecticut courts give virtually no indication as to whether workers can be both franchisees and employees at the same time. Moreover, and as important, Connecticut cases are silent as to how the state franchise law should be harmonized with more general state employment regulations. And without this knowledge we cannot know the appropriate result in this case regardless of whether appellants are employees,

2

franchisees, or both. For these reasons, I believe that in this case certification to the Connecticut Supreme Court is absolutely necessary.

The majority today holds that appellant workers are both employees and franchisees. It further holds that, as franchisees, they can be made to make payment such as franchise and finder's fees without violating Connecticut labor laws. But such holdings rest on unwarranted readings of Connecticut law. As a federal court we are empowered to evaluate questions of state law, provided that we do so with fidelity to states' interpretations of their own laws. Where state law is unclear, however, our normal course must be to ask the state courts for guidance on the matter. That conversation is the essence of judicial federalism. In this case, appellants asked the district court to seek such guidance, which it declined to do. Our court has now made the same mistake. I would certify the relevant determinative Connecticut law questions to the Connecticut Supreme Court, and respectfully dissent from our failure to do so.

## I.

The court's mistake can be seen first by considering appellants' unjust enrichment claim. Connecticut's anti-kickback statute states in relevant part:

> No employer . . . shall, directly or indirectly, demand, request, receive or exact any refund of wages, fee, sum of money or

contribution from any person, or deduct any part of the wages agreed to be paid, upon the representation or the understanding that such refund of wages, fee, sum of money, contribution or deduction is necessary to secure employment or continue in employment. No such person shall require, request or demand that any person agree to make payment of any refund of wages, fee, contribution or deduction from wages in order to obtain employment or continue in employment.

Conn. Gen. Stat § 31-73(b).

In other words, the statute "prohibits an employer from demanding any sum of money from an individual as a requirement of employment or as a requirement for continued employment." *Lockwood v. Pro. Wheelchair Transp., Inc.*, 654 A.2d 1252, 1257 (Conn. App. Ct. 1995). At the motion to dismiss stage, the district court noted that "[p]laintiffs conceivably could prove that the parties' underlying agreement was an employment agreement that conditioned initial or continued employment on payment of a down payment or any number of other fees and is therefore void as a matter of law." SA 21. During discovery, appellants produced the relevant contracts and pointed to several provisions which would violate the anti-kickback statute, provided that appellants could properly be understood to be employees. They showed that they paid large up-front fees in order to receive work assignments from Jani-King in the first place.

4

The size of the initial fee was linked to the amount of work Jani-King assigned.[1] They were also required to pay "finder's fees" for additional clients referred by Jani-King according to a pay schedule that Jani-King could change at any time. As Jani-King described in its brief, these fees were paid in exchange for "additional account referrals."

Was this arrangement an unlawful kickback in violation of Conn. Gen. Stat. § 31-73(b)? The question cannot be resolved without knowing whether appellants are properly understood as employees or franchisees, or some combination of the two. And if they are some hybrid of both statuses, which is controlling under Connecticut law? As Judge Menashi stated at oral argument, Oral Argument at 35:00, it is perfectly legal, and indeed routine, for independent contractors who enter franchise agreements to pay for the right to operate that franchise. By contrast, employers are prohibited from charging employees for a job under Conn. Gen. Stat. § 31-73(b). The district court wrote that appellants "provided no basis for distinguishing their claims for relief from legitimate fees within the franchise agreement." SA 38. But whether they have done so or not depends on whether they can be both employees and franchisees, and the

---

[1] This arrangement, where size of fee was correlated to amount of work, suggests that the money was paid in exchange for getting work, not for a standard set of franchise benefits.

consequences of such "dual status." And these questions, as previously stated, are unresolved by Connecticut law.

Both the district court and the majority seek to avoid the problem by using Connecticut's so-called "ABC test" to categorize appellants for purposes of the anti-kickback statute. And Connecticut law does indeed apply this test in other contexts. The ABC test is set forth in Connecticut's Unemployment Compensation Act, Conn. Gen. Stat. § 31-222(a)(1)(B)(ii), to determine whether workers are properly classified as employees or independent contractors for the purposes of that act, and, by its terms, for that act only. In 1995, the Connecticut Supreme Court held that the ABC test was also applicable to claims brought under the Connecticut Minimum Wage Act. *Tianti ex rel. Gluck v. William Raveis Real Estate, Inc.*, 651 A.2d 1286, 1290 (Conn. 1995). The Court acknowledged this express application of this test to minimum wage law again in *Standard Oil of Conn., Inc. v. Adm'r, Unemployment Comp. Act.*, 134 A.3d 581, 594 (Conn. 2016) (describing *Tianti*'s holding as: "[T]he ABC test was applicable in determining the existence of an employment relationship between the salespersons and the defendant" for the purposes of § 31-72).

But the courts of Connecticut have never held that the ABC test applies to define who is covered by the anti-kickback statute. And notwithstanding its holdings for minimum wage law, Connecticut law does not tell us whether appellants are employees, franchisees, or both, for purposes of that statute.

Very recently, the U.S. Court of Appeals for the First Circuit certified precisely this question—whether the ABC test should make this leap to the franchise context—to the Massachusetts Supreme Judicial Court in a case called *Patel v. 7-Eleven, Inc.*, No. 20-1999, 2021 WL 3486175 (1st Cir. Aug. 9, 2021). There, our sibling circuit humbly acknowledged its own ignorance, an ignorance we share, as to whether the ABC test applies to the relationship between a franchisor and a franchisee. *Id.* at *2.[2] Just like that case, the "outcome of this appeal hinges on a question of [Connecticut] law, upon which the [Connecticut] courts have not spoken." *Id.* at *1. This degree of uncertainty alone should be enough to certify.

Having applied the ABC test to issues that are not clearly governed by that test, and, under that test, having found that appellants are employees, the district court held that appellants could be both employees and franchisees. It then

---

[2] Because Massachusetts does not have its own franchise law, instead relying on federal law, that case concerns harmonizing Massachusetts labor law with the FTC's franchise regulations, rather than state franchise laws.

7

found their claims to be invalid because appellants—being franchisees—were governed exclusively by the Franchise Act, Conn. Gen. Stat. § 42-133e(b). Thus, the district court presumed appellants' franchisee status predominated over their employee status. But no such presumption is warranted. Even if the court were correct in its guess that under Connecticut law workers can be both franchisees and employees, the district court could not know what Connecticut labor law standards apply to such "dual" workers.

## II.

The answer to that question determines how we view both the pre-work payments and post-work deductions at issue in this case. If the workers are simply franchisees, then both are likely acceptable. The pre-work payments may be standard fees paid by franchisees to a franchisor for the privilege of operating a legitimate franchise. And the post-work deductions may be allowable pursuant to a valid contract. If, instead, the workers are employees then any such payments were made in exchange for employment and are prohibited by the Connecticut anti-kickback statute. *See* Conn. Gen. Stat. § 31-71e. And, similarly, post-work deductions may well be illegal reductions from earned wages. *See* Conn. Gen. Stat. § 31-73(b).

8

The majority attempts to circumvent the problem by claiming that the questions before us have already been answered. It does so in its discussion of the minimum wage claim by mischaracterizing the holding of the Appellate Court of Connecticut in *Jason Roberts, Inc. v. Adm'r*, 15 A.3d 1145 (Conn. App. Ct. 2011), and by overreading the decision of the Supreme Court of Connecticut in *Mytych v. May Dep't Stores Co.*, 793 A.2d 1068 (Conn. 2002).

In *Jason Roberts*, a worker claimed to be a misclassified employee of a cement company, and he sought unemployment benefits under Conn. Gen. Stat. § 31-222. The putative employer pointed to a franchise agreement between the parties and argued that the agreement rendered § 31-222 inapplicable. *Jason Roberts*, 15 A.3d at 1149. The Appellate Court of Connecticut disagreed. It wrote, the employer "neither cites, nor does our research reveal, any legal support for this argument. . . . The act makes no express exemption for franchises, nor can we imply an exemption[.]" *Id*. at 1149–50. Thus, the case stands for the proposition that the existence of a franchise agreement does not per se render employment law inapplicable.

In the majority's hands, *Jason Roberts* transforms into a virtually opposite holding. It becomes an affirmation that "an individual can be an employee under

9

the ABC test . . . even if that same individual is also a franchisee." Maj. at 10. The majority then goes on to assert, without citation, that "[i]f an individual qualifies as both a franchisee and an employee, she would be entitled to the protections of both the Connecticut Franchise Act and the employment-related provisions of Connecticut law." *Id.* The majority then concludes—again without citation—that the freedom of contract implied in the Franchise Act trumps the limitations on that freedom mapped by Connecticut's employment laws. But in fact, *Jason Roberts* says nothing about whether a worker can be both a franchisee and an employee under the minimum wage act or the anti-kickback statute. And, more important, it nowhere suggests how to harmonize these laws if a worker can be both.

Indeed, if anything, *Jason Roberts* directly supports appellants' position. Although the court "appreciate[d] that franchises are business arrangements that can differ in many ways from a traditional employment relationship," it was bound to "construe and apply the [unemployment] statute as [it found] it." *Jason Roberts*, 15 A.3d at 1150 (internal quotations omitted). Put simply, the case suggests that once a worker qualifies as an employee, Connecticut employment law applies, regardless of whether they signed a contract marked "Franchise

Agreement." Thus, properly understood, *Jason Roberts* at least leaves us no closer to resolving our key questions.

The majority next turns to *Mytych v. May Dep't Stores Co.*, 793 A.2d 1068 (Conn. 2002) for support. *Mytych* states the uncontroversial proposition that "the employer-employee agreement, as opposed to a statutory formula, control[s] the manner in which wages are calculated." *Mytych*, 793 A.2d at 1072. Asserting, correctly, that "there is a strong public policy in Connecticut favoring freedom of contract," the majority holds that it must therefore adopt the definition of wages in the franchise agreements, even if Mr. Mujo, Mr. Muharremi, and the class of workers they represent entered into the agreements "unwisely." Maj. at 12 (quoting *Geysen v. Securitas Sec. Servs. USA, Inc.*, 142 A.3d 227, 234 (Conn. 2016)).

But by this analysis, the majority assumes the answer to the question before it. Employees may be free to determine how their wages are calculated. Yet there is no reason to assume the same is necessarily true as to "franchise agreements" made by workers who are misclassified as franchisees or as some hybrid mixture of franchisees and employees. The proper inquiry as to these workers is not whether the disputed fees are wages, but whether the Franchise Agreements violate public policy in the specific ways that Connecticut courts

11

define public policy. Thus, while "it is well established that parties are free to contract for whatever terms on which they may agree . . . it is equally well established that contracts that violate public policy are unenforceable." *Geysen*, 142 A.3d at 233.

And a franchise contract provision might well violate public policy if it "acts to negate the wage statutes," or "negate[s] laws enacted for the common good," or is "designed to evade statutory requirements." *Id.* at 234. The Amended Complaint includes detailed allegations that the Franchise Agreements fall into precisely the situations contemplated by *Geysen*. It states that the Agreements misrepresent appellants as franchisees rather than employees, violating public policy by acting to "negate the wage statutes."

Thus, the majority compounds the district court's errors. First, it repeats that court's misreading of *Jason Roberts* as holding that a worker can be both a franchisee and an employee in Connecticut. Maj. at 17. Next, it decides that a Connecticut "employee-franchisee" is free to enter any "compensation agreement that defines her compensation," however unwise. *Id.* at 18. But each of these steps requires the majority to spin Connecticut law out of whole cloth. And there is no Connecticut authority explaining a) how to define a worker as an

employee or franchisee for purposes of the anti-kickback statute, b) whether a worker can be an employee and franchisee at the same time, or c) how employee and franchise law would apply to such a "dual" worker.

## III.

I am especially troubled because these are weighty questions of Connecticut law and policy, which Connecticut should have the opportunity to answer. Data on Connecticut are hard to come by, but what we do know suggests that worker misclassification has long been a serious problem in that state. In addition to violating employment rights of workers, misclassification costs state and local government crucial revenues from payroll, unemployment insurance, and workers' compensation. According to a 2011 report of the Connecticut Joint Enforcement Commission on Employee Misclassification, in a single year the state Labor Department issued 127 stop work orders for misclassifying workers and collected nearly $40,000 in civil penalties. Joint Enf't Comm'n on Emp. Misclassification, State of Conn., Annual Report 2 (2011), https://perma.cc/YU9Z-RC26. Additional investigation led to reclassifying 6,500 workers and the discovery of $50 million in unreported or underreported payroll. *Id.* at 3. That year, the state Department of Revenue Services conducted

its own misclassification investigation and assessed taxes, penalties, and interest totaling more than $600,000. *Id.* Earlier, an independent report found that 42% of audited employers in Connecticut had misclassified workers. Lalith de Silva, et al., Planmatics, Inc., Prepared for the US Department of Labor Employment and Training Administration, Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs 58 (2000), http://wdr.doleta.gov/owsdrr/00-5/00-5.pdf.

Despite the importance of this issue, the lack of Connecticut Supreme Court guidance, and the centrality of unanswered legal questions to the disposition of this case, the majority sees fit to tell Connecticut just how to blend together its franchise laws with its employment laws, applying the ABC test in a new context and creating a brand-new category of worker—the "employee-franchisee"—in the process. It treats appellants as employees for its analysis of their minimum wage claim, and as franchisees for the purposes of the anti-kickback statute claim. It then decides that because there are general statutes on these subjects, and because the Connecticut Supreme Court has affirmed the state's commitment to freedom of contract, appellants have no viable claims. But

in fact, all these are important Connecticut legal questions that are not properly ours to decide.

Many decisions on whether to certify are matters of judgment: How confident can we be that the highest court of the relevant state would say its law means what we say it does? If we decline to certify because we are overly confident in our capacity to guess, and the state subsequently decides a case the opposite way, we look foolish, and more importantly, we have been unfair to the parties. Moreover, in Connecticut, certification need not be an obstacle to speedy justice; in Connecticut, federal district courts are permitted to certify questions directly to the Connecticut Supreme Court, saving time and money.

Certification is fully consistent with the practice of the Supreme Court and our court. When state law is unclear, the Supreme Court has regularly used certification. And, on occasion, rather than certify directly itself, it has remanded to a lower court with instructions for that court to certify a question. *See McKesson v. Doe*, 141 S. Ct. 48, 51 (2020); *Bellotti v. Baird*, 428 U.S. 132, 151–52 (1976); *Lehman Bros. v. Shein*, 416 U.S. 386, 391–92 (1974); *Clay v. Sun Ins. Off. Ltd*, 363 U.S. 207, 212 (1960).

15

We have gone further. In two relatively recent cases, our court has successfully and usefully certified questions where state law was far clearer than in the case before us or than in the above-mentioned Supreme Court cases. *Glob. Reinsurance Corp. of Am. v. Century Indem. Co*, 843 F.3d 120, 122 (2d Cir. 2016), *certified question accepted*, 68 N.E.3d 98 (2017), and *certified question answered*, 91 N.E.3d 1186 (2017); *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740 (2d Cir. 2014), *certified question answered*, 118 A.3d 175 (Del. 2015). In both cases, we did so because there were indications that the state's highest courts might deviate from their prior holdings. Moreover, in an even more recent decision, *Glover v. Bausch & Lomb Inc.*, we certified because the outcome, as here, "ultimately turn[ed] on questions of state law for which no controlling decisions of the Supreme Court of Connecticut exist." No. 20-1156-CV, 2021 WL 3042364, at * 4 (2d Cir. July 20, 2021). And we did so even though—unlike the instant case—certification was not requested by any party. We did so *nostra sponte* because "[w]e have long recognized the appropriateness of according to state courts the opportunity to decide significant issues of state law through the certification process." *Id.* (quoting *Corsair Special Situations Fund, L.P. v. Pesiri*, 863 F.3d 176, 183 (2d Cir. 2017)).

16

In the absence of controlling decisions of the Supreme Court of Connecticut on the significant issue of worker classification and its consequences, we clearly should certify this case to the Connecticut Supreme Court. I would therefore vacate and remand to the district court with instructions to certify appropriate questions to the Connecticut Supreme Court. Because the majority fails to do this, I respectfully dissent.